```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
                                  x        06 Cv. 803 (SWK)
In re TAKE-TWO INTERACTIVE        x
SECURITIES LITIGATION             x        OPINION AND ORDER
                                  x
----------------------------------X
```

**SHIRLEY WOHL KRAM, U.S.D.J.**

**TABLE OF CONTENTS**

I.    BACKGROUND ........................................................ 1

 A.  Procedural History....................................... 1

 B.  Parties.................................................. 2

 C.  Factual Allegations..................................... 4

  1.  The GTA:SA Fraud....................................... 5

  2.  The Options Backdating Fraud........................... 9

 D.  Legal Claims............................................ 12

II.   DISCUSSION ........................................................ 13

 A.  Claims for Material Misrepresentations Under Section
     10(b) and Rule 10b-5.................................... 15

  1.  The GTA:SA Fraud....................................... 16

   i.   The SAC Adequately Alleges a False Statement and
        Misleading Omission in Take-Two's 2004 and 2005
        Forms 10-K............................................ 17

   ii.  The Alleged Misleading Statement in Take-Two's 2004
        and 2005 Forms 10-K Is Attributable to Defendants
        Take-Two, Eibeler, Winters, Emmel, Flug, and Grace.... 28

    a.  The Group Pleading Doctrine Does Not Apply to
        Brant................................................ 29

    b.  The Exception for Subsidiary Liability Does Not
        Apply to the Rockstar Defendants..................... 33

   iii. The SAC Fails to Allege Scienter with Respect to
        All Defendants........................................ 35

    a.  The SAC Inadequately Pleads Scienter With Respect
        to Brant, Houser, and Donovan........................ 36

     (1) The SAC Insufficiently Alleges That Houser,
         Donovan, and Brant Possessed a Motive to Commit
         Fraud............................................... 37

(2)  The SAC Alleges Insufficient Circumstantial Evidence of Knowledge or Recklessness With Respect to Brant, Houser, and Donovan.............. 39

b.  The SAC Inadequately Pleads Eibeler's Scienter....... 45

(1)  The SAC Insufficiently Alleges That Eibeler Possessed a Motive to Commit Fraud................. 46

(2)  The SAC Alleges Insufficient Circumstantial Evidence of Eibeler's Knowledge or Recklessness..... 47

c.  The SAC Inadequately Pleads Scienter With Respect to Emmel, Flug, and Grace........................... 50

d.  The SAC Inadequately Pleads Winters's Scienter....... 55

(1)  The SAC Adequately Alleges Winters's Motive and Opportunity to Commit Fraud....................... 55

(2)  The SAC's Proposed Inference of Scienter Is Not as Compelling as Competing Nonculpable Explanations....................................... 57

e.  The SAC Inadequately Pleads Scienter With Respect to Take-Two and Rockstar........................... 65

2.  The Options Backdating Fraud.......................... 67

i.  The SAC Sufficiently Pleads Loss Causation Only as to the July 10 Disclosure of SEC's Informal Investigation....................................... 68

a.  Loss Causation May Not Be Predicated upon the June 26 Disclosure....................................... 69

b.  Loss Causation May Be Predicated Upon the July 10 Disclosure......................................... 78

ii.  The SAC Adequately Alleges the Materiality of Defendants' Misstatements Regarding Options Backdating......................................... 88

iii. The SAC Adequately Pleads Scienter With Respect to Take-Two, Brant, Eibeler, Emmel, Flug, and Grace...... 94

a.  The SAC Adequately Alleges Brant's Scienter......... 95

    b.    The SAC Adequately Alleges Scienter With Respect to Emmel, Flug, and Grace............................ 96

    (1)   The SAC Adequately Alleges that Emmel, Flug, and Grace Possessed Motive and Opportunity.............. 96

    (2)   The Inference That Emmel, Flug, and Grace Acted With Scienter Is More Compelling Than Competing Nonculpable Explanations for Their Conduct......... 108

    c.    The SAC Inadequately Alleges Eibeler's Scienter..... 114

    (1)   The SAC Adequately Alleges That Eibeler Possessed Motive and Opportunity............................ 115

    (2)   The Inference That Eibeler Acted With Scienter Is Not as Compelling as Competing Nonculpable Explanations for His Conduct....................... 116

    d.    The SAC Inadequately Alleges Winters's Scienter..... 121

    e.    The SAC Adequately Alleges Take-Two's Scienter...... 125

B.    Claims for Violations of Section 20(a) of the Exchange Act.......................................... 126

 1.   The GTA:SA Fraud..................................... 127

 2.   The Options Backdating Fraud......................... 128

C.    Claims for Violations of Section 20A(a) of the Exchange Act.......................................... 132

D.    Leave to Amend the SAC................................ 139

III.   CONCLUSION ............................................ 142

In this putative class action, the New York City Employees' Retirement System, the New York City Police Pension Fund, and the New York City Fire Department Pension Fund (collectively, "Lead Plaintiffs") bring various securities fraud claims against Take-Two Interactive Software, Inc. ("Take-Two" or the "Company"); its wholly-owned subsidiary, Rockstar Games, Inc. ("Rockstar"); and several of these companies' officers and directors (collectively, "Defendants"). Pending before the Court are various motions to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). For the reasons that follow, the Court grants these motions in part and denies them in part. Additionally, the Court grants Lead Plaintiffs' request for leave to amend deficient portions of their pleadings.

## I.    BACKGROUND

### A. Procedural History

On February 2, 2006, the first of several putative class actions alleging that Take-Two had committed securities fraud was filed in this District. 06 Cv. 803 (SWK), Dkt. No. 1. In an order signed on July 12, 2006, the Court consolidated that action with all related securities cases pending in this District, and appointed Lead Plaintiffs to represent the putative class. 06 Cv. 803 (SWK), Dkt. No. 33.

Pursuant to a scheduling order also issued on July 12, 2006, see 06 Cv. 803 (SWK), Dkt. No. 32, Lead Plaintiffs filed the Consolidated Amended Complaint (the "AC") on September 11, 2006, 06 Cv. 803 (SWK), Dkt. No. 34. The AC charged that Defendants made material misrepresentations and omissions in public statements respecting: (1) Take-Two's compliance with the video game rating requirements of the Entertainment Software Ratings Board (the "ESRB"); and (2) Take-Two's compliance with its stock-option plans and accounting for stock-option grants to several officers and directors.

In a scheduling order filed on January 3, 2007, the Court halted briefing on motions to dismiss the AC, in contemplation of Take-Two's anticipated financial restatement, 06 Cv. 803 (SWK), Dkt. No. 48, which the Company eventually issued on February 28, 2007. On April 16, 2007, Lead Plaintiffs timely filed the Consolidated Second Amended Complaint (the "SAC"), which reiterated, with the benefit of more recent factual developments, the securities fraud claims set forth in the AC. 06 Cv. 803 (SWK), Dkt. No. 51. Thereafter, Defendants filed the motions to dismiss that are the subject of this Opinion.

**B. Parties**

Lead Plaintiffs "are actuarial pension systems of the City of New York." (SAC ¶ 37(a).) They are joined by an additional class representative, the State-Boston Retirement System, which

"is the actuarial pension system of the City of Boston." (SAC ¶ 37(b).) These large institutional investors purport to bring this action "on behalf of all persons and entities who purchased or otherwise acquired common stock of Take-Two" between December 17, 2002, and July 10, 2006 (the "Class Period"). (SAC ¶ 1.)

The SAC names both corporate and individual defendants. The corporate defendants are Take-Two and Rockstar. Take-Two is a public company whose stock is traded on the Nasdaq National Market ("NASDAQ"). Among other things, Take-Two "manufactures and markets video games and video game accessories." (SAC ¶ 38.) Rockstar, a wholly-owned subsidiary of Take-Two, develops video games for publication and distribution by its parent corporation. Rockstar is affiliated with another of Take-Two's wholly-owned subsidiaries, Rockstar North Ltd., the entity that created the popular video game distributed by Take-Two, Grand Theft Auto: San Andreas ("GTA:SA"). (SAC ¶ 39.)

The SAC names eight individual defendants, all of whom are former and current officers and directors of Take-Two and Rockstar: Paul Eibeler ("Eibeler") was the Chief Executive Officer ("CEO") of Take-Two from January 2005 through March 2007, the President of Take-Two from July 2000 through June 2003 and again from April 2004 through March 2007, and a director of Take-Two from December 2000 through February 2003. (SAC ¶ 40(a).) Karl Winters ("Winters") was Chief Financial Officer

3

("CFO") of Take-Two from February 2002 until April 2007. (SAC ¶ 41(a).) Ryan Brant ("Brant") founded Take-Two and acted as the Company's Chairman and CEO until March 2004. From March 2004 through October 2006, Brant was Take-Two's Vice President of Publishing. (SAC ¶ 42(a).) Sam Houser ("Houser") is, and at all times relevant to this action was, the President and co-founder of Rockstar. (SAC ¶ 43.) Terry Donovan ("Donovan") is, and at all times relevant to this action was, the CEO of Rockstar. (SAC ¶ 44.) Robert Flug ("Flug") was a director of Take-Two from February 1998 through March 2007. Flug was also a member of the compensation committee of Take-Two's board of directors (the "Compensation Committee") from 2000 through December 2006, and the Chairman of that committee between 2004 and December 2006. (SAC ¶ 45.) Oliver Grace, Jr. ("Grace") was a director of Take-Two from April 1997 through March 2007, and a member of the Compensation Committee from 2000 until December 2006. (SAC ¶ 46.) Todd Emmel ("Emmel") was a member of Take-Two's board of directors from February 2002 through March 2007, and a member of the Compensation Committee between 2002 and 2003. (SAC ¶ 47.)

## C. Factual Allegations

The SAC avers that Defendants made material misrepresentations and omissions concerning: (1) Take-Two's compliance with the ESRB's rules in the rating of GTA:SA (the "GTA:SA Fraud"); and (2) Take-Two's compliance with its stock-

4

option plans and accounting for stock-option grants to several officers and directors (the "Options Backdating Fraud"). The following sections outline the SAC's factual allegations with respect to these two largely distinct frauds.

### 1. The <u>GTA:SA</u> Fraud

Take-Two publishes video games widely known for their adult themes. (SAC ¶¶ 117-18.) Take-Two's most successful product is the <u>Grand Theft Auto</u> video game series, which accounted for thirty-four to forty percent of Take-Two's annual revenues from 2002 through 2005. (SAC ¶ 121.) Since its initial release in 1998 (SAC ¶ 21), the <u>Grand Theft Auto</u> series has featured violence, profanity, and illegal behavior (<u>see</u> SAC ¶ 23).

On March 1, 2004, Take-Two announced the release of the next installment in the <u>Grand Theft Auto</u> series, <u>GTA:SA</u>. (SAC ¶ 122.) Throughout the summer of 2004, several Rockstar employees, including defendants Houser and Donovan, discussed the inclusion of explicit sexual content in <u>GTA:SA</u>. (SAC ¶¶ 123, 125.) Among the sexual scenes considered for inclusion in <u>GTA:SA</u> was a highly-developed, participatory minigame that allowed players to control one of the video game's characters as he performed sexual acts (the "Sex Minigame"). (SAC ¶ 23.) After substantial deliberation involving Rockstar employees, including defendants Houser and Donovan, as well as one Take-Two employee, defendant Brant (SAC ¶¶ 125, 133-40), the decision was made to exclude the

Sex Minigame from available game play in the final version of GTA:SA (SAC ¶ 140).

This decision was based at least in part on concerns, raised by defendants Houser and Donovan, regarding the rating that the ESRB would bestow upon GTA:SA. (SAC ¶ 133.) The ESRB is a self-regulatory organization established to provide guidance for retailers and consumers in stocking and purchasing video games. (SAC ¶ 128.) The ESRB assigns rating categories to each game it evaluates, ranging from the least restrictive, "Early Childhood," to the most restrictive, "Adults Only" ("AO"). (SAC ¶ 129.) If a game is rated "AO," large retailers such as Wal-Mart, Circuit City, and Best Buy will not sell it (SAC ¶ 130), thereby closing important distribution channels to the game's vendor (SAC ¶¶ 130, 134). Various Rockstar employees, including defendants Houser and Donovan, expressed concern in the months leading up to the release of GTA:SA that the Sex Minigame, as well as other graphic sexual content, would cause the ESRB to assign GTA:SA an "AO" rating. (SAC ¶¶ 134, 135, 137.) The Sex Minigame was thus excluded from normal game play in the final version of GTA:SA. (SAC ¶¶ 133, 140.)

Completely eliminating the Sex Minigame from GTA:SA's code would have been costly. The deletion of code from a video game is a time-consuming and potentially expensive process. (SAC ¶¶ 25-26, 140-41.) Indeed, because various sections of a game's

code often interact, the deletion of one section of code may have undesired consequences for other sections. (SAC ¶ 141.) In order to obviate the potential shortcomings of deletion, the code for the Sex Minigame was rendered inaccessible through an alternative process known as "wrapping." (SAC ¶¶ 140-41.) Unlike deleted code, "wrapped" video game code remains on the game disc. (SAC ¶ 140.) Nonetheless, a video game user cannot access wrapped code without deliberately modifying the game's code. (SAC ¶¶ 140, 145.)

Notwithstanding the presence of the wrapped Sex Minigame in GTA:SA's code, Take-Two did not disclose the content of the Sex Minigame to the ESRB when it submitted GTA:SA for rating. (SAC ¶ 143.) In September 2004, the ESRB assigned the Playstation 2 ("PS2") version of GTA:SA a rating of "Mature 17+" ("M"), which is one rating level below the undesired "AO." (SAC ¶¶ 143, 130.) The PS2 version of GTA:SA, which was released on October 25, 2004, also sold under the rating "M" (SAC ¶ 168), as did the personal computer ("PC") version of GTA:SA, which was released on June 7, 2005 (SAC ¶ 169).

On June 9, 2005, a modification ("mod") that unlocked the Sex Minigame became available on the PC version of GTA:SA. (SAC ¶¶ 30, 169.) Apparently, the mod was also made available on the PS2 and X-Box versions of GTA:SA some time shortly thereafter. (SAC ¶¶ 163-65; 172.) The mod was referred to as "Hot Coffee"

7

because the Sex Minigame commenced with the game's protagonist accepting a woman's invitation into her home for coffee. (SAC ¶ 30.) "Hot Coffee" had circulated widely by late June 2005, prompting the initiation in early July of an ESRB investigation into the re-rating of GTA:SA. (SAC ¶¶ 170-71.) On July 20, 2005, the ESRB announced that it had re-rated GTA:SA as "AO" in light of the "Hot Coffee" mod. (SAC ¶ 175.) Immediately thereafter, retailers such as Best Buy, Circuit City, and Wal-Mart pulled GTA:SA from their shelves, and Take-Two dramatically reduced its revenue and earnings projections for the remainder of the 2005 fiscal year. (SAC ¶ 32.) On July 21, 2005, one day following the re-rating of GTA:SA, Take-Two's stock dropped 4.9% on trading volume that was five times the average. (SAC ¶ 177.) Various local, state, federal, and foreign governmental entities announced investigations into the rating and sale of GTA:SA in the weeks and months that followed. (SAC ¶¶ 178-83.) The price of Take-Two stock dropped precipitously shortly after the announcements of two of these investigations. (SAC ¶¶ 323-24.)

Throughout the Class Period, Take-Two issued various public statements asserting that it complied with the ESRB's rating rules and requirements. (SAC ¶¶ 185, 222, 227, 232, 233.) Lead Plaintiffs assert that these public statements were false and misleading because Take-Two had violated the ESRB's rules by failing to divulge the presence of the wrapped Sex Minigame in

GTA:SA's code. (SAC ¶¶ 235, 261, 273.) Lead Plaintiffs also aver that Defendants knew these statements to be false (SAC ¶¶ 235, 261, 273), in part because of the allegedly clear requirements of the ESRB submission process, but also because of certain facts about the market for Take-Two's products. In particular, the fan base for the Grand Theft Auto video game series includes knowledgeable computer programmers who routinely engage in the development of mods. (SAC ¶ 145.) Moreover, Rockstar's official webpage for GTA:SA lists a number of websites that prominently feature mods and expressly refers to such sites as sources of mods. (SAC ¶ 148.) Accordingly, Lead Plaintiffs aver that Defendants knew and intended that the Sex Minigame would become widely accessible, despite its wrapping. (SAC ¶¶ 144, 166; see also SAC ¶ 159.)

## 2. The Options Backdating Fraud

From 1997 through 2005, Take-Two issued stock options to certain of it officers and directors. (SAC ¶ 70.) The Company made these stock-option grants pursuant to two Stock Option Plans, which each provided that the exercise price at which shares of Take-Two common stock could be purchased would not be less than 100% of the fair market value of Take-Two shares on the grant date. (SAC ¶¶ 62-64.) In its annual reports to the Securities and Exchange Commission (the "SEC") during the Class Period, Take-Two stated that it accounted for these stock-option

9

grants in accordance with Accounting Principles Board Opinion No. 25 ("APB 25"). (SAC ¶ 66.) That Opinion requires a company to record a compensation cost when an option is accorded an exercise price below the market value of the shares on the grant date. (SAC ¶ 108.)

Despite these public representations, during the Class Period "the dates of stock option grants to insiders at Take-Two were routinely manipulated to fall on days with the lowest stock prices." (SAC ¶ 71.) A special committee of Take-Two's board of directors (the "SC") concluded in a report published on January 22, 2007, that defendant Brant had controlled the company's options-granting process and had engaged in a pattern of options backdating between April 1997 and August 2003. (SAC ¶ 84.) On February 14, 2007, the Manhattan District Attorney's Office announced that Brant had pleaded guilty to falsifying Take-Two's business records in furtherance of widespread options backdating. (SAC ¶ 85.) On that same date, the SEC announced that it had filed and settled civil charges against Brant for granting undisclosed, "in the money"[1] stock options to himself and to other Take-Two officers and employees. (SAC ¶ 88.)

The beneficiaries of Take-Two's pattern of options backdating included not only Brant, but also defendants Eibeler,

---

[1] An option is "in the money" if the market price of the underlying shares at the time of the grant is above the option's exercise price. (SAC ¶ 61.)

Flug, Grace, and Emmel. (SAC ¶¶ 77, 80.) On February 23, 2007, Take-Two announced that certain options issued to defendants Flug, Grace, and Emmel had been improperly dated, and that these individuals had entered into an agreement to repay improper stock-option compensation. (SAC ¶¶ 92, 95.) On February 28, 2007, Take-Two issued its Form 10-K for fiscal year 2006, which reported that although Brant was primarily responsible for Take-Two's options backdating, certain past employees and past members of management had assisted him. (SAC ¶¶ 96-97.) The 2006 Form 10-K also stated that the Compensation Committee, which included defendants Flug, Grace, and Emmel, had abdicated its responsibilities in the options-granting process. (SAC ¶ 98.)

According to Lead Plaintiffs, the existence of widespread options backdating at Take-Two rendered false and misleading various material statements made in Take-Two's public disclosures during the Class Period. First, contrary to its public statements, Take-Two "did not grant employee stock options at 100% of the fair market value on the date of grant." (SAC ¶¶ 192(a), 210(a), 234(a), 260(a), 272(a).) Second, Take-Two "did not account for employee stock options in compliance with APB 25" (SAC ¶¶ 192(b), 210(b), 234(b), 260(b), 272(b)) because it did not take compensation expenses for "in the money" options grants. (See SAC ¶¶ 108-10.) Third, "by reason of its improper accounting for employee stock options, [Take-Two]

11

materially understated compensation expenses and materially overstated net income." (SAC ¶¶ 192(c), 210(c), 234(c), 260(c), 272(c).) In fact, Take-Two's earnings were overstated by 20% in fiscal year 2002, 11% in fiscal year 2003, and 5-6% in fiscal years 2004 and 2005. (SAC ¶ 99.)

## D. Legal Claims

The SAC recites four counts of securities fraud:

Count I of the SAC alleges that Defendants made materially misleading statements and omissions throughout the Class Period, thereby deceiving the investing public into purchasing shares of Take-Two common stock at inflated prices, in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 thereunder. (SAC ¶ 330-31.) Count I is premised upon the alleged misleading statements that underlie both the GTA:SA Fraud and the Options Backdating Fraud, as described in the preceding sections. (See SAC ¶¶ 336-42.)

Count II asserts claims against defendants Brant, Eibeler, and Winters for control-person liability under Section 20(a) of the Exchange Act. (SAC ¶ 348.) According to Count II, these defendants influenced and controlled Take-Two in its perpetration of the GTA:SA Fraud and the Options Backdating Fraud. (SAC ¶ 349.)

Count III advances control-person claims under Section 20(a) of the Exchange Act against defendants Take-Two, Donovan,

and Houser. (SAC ¶ 353.) Count III alleges that these defendants influenced and controlled Rockstar in its involvement in the GTA:SA Fraud. (SAC ¶ 354.)

Count IV avers that defendants Winters, Flug, and Grace violated Section 20A(a) of the Exchange Act by selling Take-Two common stock while in possession of material, adverse, non-public information regarding the GTA:SA Fraud. (SAC ¶¶ 358-60.)

Defendants have moved, under Federal Rules of Civil Procedure 12(b)(6) and 9(b), and under the PSLRA, to dismiss all four counts of the SAC for failure to state a claim upon which relief can be granted.

## II.  DISCUSSION

In ruling upon a motion to dismiss an action for securities fraud, courts must accept the complaint's allegations as true, Tellabs, Inc. v. Makor Issues & Rights, Ltd. 127 S.Ct. 2499, 2509 (2007), and draw all reasonable inferences in the plaintiff's favor, Caiola v. Citibank, N.A., 295 F.3d 312, 321 (2d Cir. 2002). In addition to the complaint and reasonable inferences drawn therefrom, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,

493 F.3d 87, 98 (2d Cir. 2007). Courts may also consider matters subject to judicial notice. <u>Tellabs,</u> 127 S.Ct. at 2509 (citation omitted).

Under Rule 12(b)(6), the touchstone for adequate pleading is plausibility. <u>Bell Atl. Corp. v. Twombly</u>, 127 S. Ct. 1955, 1974 (2007); <u>see also</u> <u>ATSI Commc'ns</u>, 493 F.3d at 98 & n.2 (applying <u>Twombly</u> to securities fraud complaint). Thus, materials properly before the court must provide grounds for more than mere speculation or suspicion that a plaintiff is entitled to the requested relief. <u>See</u> <u>Twombly</u>, 127 S. Ct. at 1965 (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004)). Instead, a plaintiff must "nudge[] [his] claims across the line from conceivable to plausible." <u>Twombly</u>, 127 S. Ct. at 1974.

In addition, securities fraud claims are subject to the heightened pleading standards set forth in Rule 9(b), which requires a plaintiff to "state with particularity the circumstances constituting fraud . . . ." Fed. R. Civ. P. 9(b). In order to satisfy Rule 9(b), a securities fraud complaint premised upon material misstatements "must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."

ATSI Commc'ns, 493 F.3d at 99 (citing Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000)).

Private securities fraud actions must also pass muster under the PSLRA. See 15 U.S.C. § 78u-4(b)(3)(A); ATSI Commc'ns, 493 F.3d at 99. In an action for money damages requiring proof of scienter, the PSLRA prescribes that "the complaint shall . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. § 78u-4(b)(2). An inference is "strong" under the PSLRA only if "a reasonable person would deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 127 S. Ct. at 2510.

The Court turns now to an assessment of the SAC's legal claims in light of the pleading standards adumbrated above.

**A. Claims for Material Misrepresentations Under Section 10(b) and Rule 10b-5**

In order to state a claim under Rule 10b-5(b) for material misrepresentations,[2] "plaintiffs must allege that [the defendants] (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their

_____

[2] Lead Plaintiffs have expressly disclaimed reliance upon the manipulative-act provisions of Rule 10b-5(a) and (c). Pls.' Opp'n 25 n.9. Thus, the Court will not address their compliance with the pleading requirements of those provisions.

injury." <u>Lentell v. Merrill Lynch & Co.</u>, 396 F.3d 161, 172 (2d Cir. 2005) (internal quotation marks and citation omitted), <u>cert. denied</u>, 546 U.S. 935 (2005). Here, Count I avers that the defendants made a series of misstatements and omissions respecting: (1) the <u>GTA:SA</u> Fraud, and (2) the Options Backdating Fraud. In the sections that follow, the Court separately addresses the adequacy of Lead Plaintiffs' pleading with respect to each fraud.

### 1. The <u>GTA:SA</u> Fraud

In their motions to dismiss, Defendants have attacked the sufficiency of Lead Plaintiffs' allegations with respect to the <u>GTA:SA</u> Fraud on three grounds. First, Defendants contend that Lead Plaintiffs have failed to identify a false statement or misleading omission in Take-Two's public disclosures concerning the company's compliance with the ESRB's rules in the rating of <u>GTA:SA</u>. Second, several defendants maintain that the SAC insufficiently attributes any alleged false statement to them individually. Third, Defendants argue that Lead Plaintiffs' factual allegations do not give rise to a strong inference of scienter. For the reasons discussed below, the Court finds that the SAC adequately alleges a false statement in Take-Two's 2004 and 2005 Forms 10-K, which is properly attributable to defendants Take-Two, Eibeler, Winters, Emmel, Flug, and Grace. Nevertheless, the SAC fails to allege facts supporting a strong

inference that any defendant acted with scienter. Thus, the Court dismisses the SAC's Section 10(b) claims insofar as they are premised upon the GTA:SA Fraud.[3]

### i. The SAC Adequately Alleges a False Statement and Misleading Omission in Take-Two's 2004 and 2005 Forms 10-K

In order to state a claim under Rule 10b-5(b), plaintiffs must specifically identify a false statement or misleading omission. See, e.g., ATSI Commc'ns, 493 F.3d at 99; Lentell, 396 F.3d at 172. Here, Lead Plaintiffs have identified two allegedly false statements that appear in several public disclosures made by Take-Two: (1) "We label and market our products in strict accordance with [ESRB] principles and guidelines" (SAC ¶¶ 232, 258); and (2) "We believe that we comply with [the ESRB's] rating systems and properly display the ratings and content descriptions received for our titles" (SAC ¶¶ 215, 222, 227, 233, 240, 247, 252, 259). Additionally, Lead Plaintiffs contend that Take-Two's various pronouncements concerning the company's compliance with the ESRB's rules, which included, inter alia, these two allegedly false statements, were rendered misleading

---

[3] Given the Court's ultimate conclusion that Lead Plaintiffs have failed to plead scienter, it arguably need not address the veracity of Take-Two's alleged false statements. Nevertheless, because the Court grants Lead Plaintiffs leave to amend, it addresses all of the alleged defects in the SAC in order to facilitate the amendment process.

by Defendants' failure to disclose that the Sex Minigame was intentionally wrapped in GTA:SA's code. (SAC ¶¶ 235, 261, 273.)

The veracity of Take-Two's statements concerning its compliance with the ESRB's rating requirements depends in part on the content of those requirements. Here, Lead Plaintiffs allege--and there seems to be little dispute--that Take-Two submitted GTA:SA to the ESRB for rating without disclosing the presence of the Sex Minigame in fully rendered, though wrapped, form. (SAC ¶ 143.) Lead Plaintiffs also aver that the discovery and subsequent widespread dissemination of the Sex Minigame was inevitable because of the prevalence of modding and the encouragement of that practice by Take-Two and Rockstar. (SAC ¶¶ 144-67.) Under these circumstances, Lead Plaintiffs argue, the defendants clearly violated the ESRB's rating rules. (See, e.g., SAC ¶ 301.) Defendants respond that the ESRB's rules, as codified at the time GTA:SA was submitted for rating, did not require disclosure of wrapped game content not meant to be seen or experienced by consumers. (Take-Two GTA:SA Mot. Dismiss 5-6, 12-13.) Thus, Defendants conclude, Take-Two's assertions that it complied with the ESRB's rating systems were literally true and cannot give rise to liability under the securities laws. (Take-Two GTA:SA Mot. Dismiss 13.)

When read in the light most favorable to Lead Plaintiffs, the SAC alleges that the ESRB's rules required the disclosure of

the Sex Minigame. According to the SAC, the ESRB obliges video game companies to submit all "pertinent content" for rating, including "the most extreme content of the final product--in terms of relevant rating criteria such as violence, language, sexuality, gambling, and alcohol, tobacco, and drug reference or use."[4] (SAC ¶¶ 131-32.) The SAC sufficiently alleges that the Sex

---

[4] Lead Plaintiffs cite the ESRB's website in making these allegations. (SAC ¶¶ 131-32.) Defendants claim that the ESRB's website displays only the current rating and submission rules, which differ from the rules in effect in 2004. (Take-Two <u>GTA:SA</u> Mot. Dismiss 5 n.5.) As support for their claim, the defendants have provided the Court with a copy of the 2004 ESRB submission packet (Take-Two <u>GTA:SA</u> Mot. Dismiss, Declaration of Stephen Chahn Lee ("Lee Decl.") Ex. 2) and a copy of the 1998 ESRB Rules and Regulations (Take-Two <u>GTA:SA</u> Mot. Dismiss, Declaration of Erin W. Sheehy ("Sheehy Decl.") Ex. 1). Under Federal Rule of Evidence 201(b)(2), courts may take judicial notice of adjudicative facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Adjudicative facts subject to judicial notice may include rules and regulations published for use in the ordinary course of business. <u>See, e.g.</u>, <u>Driebel v. City of Milwaukee</u>, 298 F.3d 622, 631 n.2 (7th Cir. 2002). Nevertheless, because the purported 2004 ESRB submission packet and the 1998 ESRB Rules and Regulations proffered by the defendants are unauthenticated and unsigned, and are not themselves public documents, the Court declines to judicially notice them. <u>See</u> <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 154 (2d Cir. 2002) (reversing district court's grant of motion to dismiss for improperly relying on extrinsic documents without converting motion into one for summary judgment).

Moreover, even if these documents were properly noticed, they do not meaningfully contradict Lead Plaintiffs' allegation that the ESRB required the submission of all pertinent content. For instance, the purported copy of the ESRB's Rules and Regulations requires game makers to submit materials that "accurately reflect the content of the complete entertainment software product including, but not limited to, elements that are the most extreme in terms of rating relevant criteria such as violence, language, sexuality, drug and alcohol use. (Sheehy

Minigame portrayed graphic sexual content. (See, e.g., SAC ¶ 23.) The SAC also avers that an ESRB official identified the Sex Minigame as "undisclosed and highly pertinent content" at the time that the ESRB announced its decision to re-rate GTA:SA on July 20, 2005. (Take-Two GTA:SA Mot. Dismiss, Declaration of Stephen Chahn Lee ("Lee Decl.") Ex. 8;[5] SAC ¶ 176.)[6] Therefore, Lead Plaintiffs' averments support an inference that Take-Two

_____

Decl. Ex. 1, Art. II, § 2.B.) Thus, the Court accepts as true Lead Plaintiffs' allegations regarding video game companies' duty to submit all pertinent content to the ESRB.

[5] Because Lead Plaintiffs referred to and relied upon this press release in drafting the SAC (SAC ¶¶ 175-76), the Court may consider it in resolving Defendants' motions to dismiss. Chambers, 282 F.3d at 153.

[6] Lead Plaintiffs have also appended to their opposition papers an article stating that the ESRB "clarified" after the release of GTA:SA that its policies prevented game companies from leaving "unfinished or other pertinent content on a disc." (Pls.' Opp'n, Declaration of Ethan D. Wohl ("Wohl Decl.") Ex. 11.) Nevertheless, because the SAC makes no mention of this article, and as there is no evidence that Lead Plaintiffs relied upon the article in drafting the SAC or in bringing suit, the Court may not consider the article as support for the truth of the matters asserting therein. See Chambers 282 F.3d at 153 (holding that on motion to dismiss court may consider documents upon which plaintiffs relied in drafting complaint); Nat'l Ass'n of Pharm. Mfrs. v. Ayerst Lab., 850 F.2d 904, 910 n.3 (2d Cir. 1988) (deeming incorporated by reference a document referenced in complaint and quoted in full in plaintiffs' memorandum of law). Moreover, although the Court may take judicial notice of the fact of the article's publication, see In re Alstom SA Sec. Litig., 406 F. Supp. 2d 402, 408-09 (S.D.N.Y. 2005), that fact bears no relevance to the pertinent question of whether the ESRB's rules required the disclosure of wrapped content at the time that Take-Two submitted GTA:SA for rating. Thus, leaving aside whether the article at issue, which suggests that the ESRB altered its rules only after the release of GTA:SA, even supports Lead Plaintiffs' allegations, the Court will not consider the article at this stage.

violated the ESRB's rules by not divulging to the ESRB the presence of pertinent sexual content, _i.e._, the Sex Minigame, in GTA:SA. (See, e.g., SAC ¶ 301.)

Of course, the Court need not draw this inference insofar as it is contradicted by documents properly considered on Defendants' motion to dismiss. In re Yukos Oil Co. Sec. Litig., 04 Cv. 5243 (WHP), 2006 WL 3026024, at *12 (S.D.N.Y. Oct. 25, 2006) (citations omitted); In re Aegon N.V. Sec. Litig., 03 Cv. 0603 (RWS), 2004 WL 1415973, at *5 (S.D.N.Y. June 23, 2004). According to a complaint filed by the Federal Trade Commission ("FTC") against Take-Two (the "FTC Complaint"), at the time that GTA:SA was rated,

> the ESRB's published requirements mandated that game companies disclose relevant content resulting from the use of "cheat codes" or the unlocking of virtual "Easter eggs" (i.e., messages, graphics, sound effects, features, or actions that are enabled when the user inputs a set of commands on a game console or keyboard). The ESRB's published requirements did not state that relevant content included . . . content in the game code that was inaccessible or unplayable without modifying the code.

(Take-Two GTA:SA Mot. Dismiss, Lee Decl. Ex. 1, FTC Compl. ¶ 10.)[7] In expressly directing game companies to submit for rating

---

[7] The FTC Complaint was attached to the Consent Order into which Take-Two and the FTC entered. (Take-Two GTA:SA Mot. Dismiss 3 n.1.) Because Lead Plaintiffs evidently relied upon the Consent Order in drafting the SAC (see SAC ¶ 181), the Court may consider the Consent Order and attached FTC Complaint in deciding Defendants' motions to dismiss. Chambers, 282 F.3d at 153. Defendants also refer the Court to the 2004 ESRB submission

content revealed through the use of "cheat codes" and "Easter eggs," but not addressing wrapped content, such as the Sex Minigame, the ESRB's rules may, impliedly, have exempted wrapped content from rating scrutiny. See, e.g., VKK Corp. v. Nat'l Football League, 244 F.3d 114, 130 (2d Cir. 2001) (discussing principle of expressio unius est exclusio alterius, i.e., that mention of one item implies exclusion of other, related item).

Such an inference is supported by the ESRB's press release concerning the re-rating of GTA:SA, in which the ESRB stated, "[g]oing forward, the ESRB will now require all game publishers to submit any pertinent content shipped in final product even if it is not intended to ever be accessed during game play or remove it from the final disc." (Lee Decl. Ex. 8.) This statement suggests that the ESRB did not require video game companies to present wrapped content for rating at the time that GTA:SA was submitted, but only instituted that policy in response to the scandal caused by GTA:SA. Thus, the record properly before the Court provides grounds to doubt Lead Plaintiffs' averments that the ESRB's rules required disclosure of the Sex Minigame.

These grounds for doubt, however, do not so "contradict" Lead Plaintiffs' averments and proposed inferences as to

---

packet. (Lee Decl. Ex. 2.) However, for the reasons stated supra, note 4, this packet is not properly before the Court.

convince the Court to disregard them. Cf. VTech Holdings, Ltd. v. PriceWaterhouseCoopers LLP, 348 F. Supp. 2d 255, 263 (S.D.N.Y. 2004) (holding that existence of written contract did not necessarily contradict plaintiff's allegation of oral contract, and thus, refusing to discredit plaintiff's claim concerning oral contract). Here, there is no complete, unambiguous statement of the ESRB's rules, properly on the record, which controverts Lead Plaintiffs' allegations. Cf. In re Yukos Oil, 2006 WL 3026024, at *14-*15 (determining that complaint failed to allege facts constituting violations of Russian tax rules where those rules were known to court); Chu v. Sabratek Corp., 100 F. Supp. 2d 827, 835 (N.D. Ill. 2000) (holding that complaint failed to allege facts constituting violations of federal regulations where those regulations were known to court). Moreover, certain materials within the Court's possession support, rather than contradict, Lead Plaintiffs' averments. To wit, the ESRB's statements concerning the "pertinence" of the Sex Minigame suggest that it believed Take-Two was required to disclose the Sex Minigame. In addition, the ESRB's decision to re-rate GTA:SA itself implies that the ESRB had determined that the game was improperly rated in the first instance. Under these circumstances, Lead Plaintiffs have plausibly alleged that the ESRB's rules required Take-Two to divulge the Sex Minigame to the ESRB. (See, e.g., SAC ¶ 301.)

Therefore, insofar as Lead Plaintiffs' claims are premised upon Take-Two's assertion, "We label and market our products in strict accordance with [ESRB] principles and guidelines," which appeared in Take-Two's 2004 and 2005 Forms 10-K (SAC ¶¶ 232, 258), Lead Plaintiffs have adequately identified a specific, allegedly false statement in Take-Two's public disclosures.[8]

---

[8] Lead Plaintiffs also adequately aver that Take-Two's 2004 and 2005 Forms 10-K omit information that should have been disclosed alongside the Company's asserted compliance with the ESRB's rules. Omissions are actionable under Rule 10b-5 only where the omitted information was material and the corporation was subject to a duty to disclose such information. In re Time Warner Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993). A duty to disclose arises with respect to, inter alia, information necessary to prevent an affirmative statement from being materially misleading. Id. (citing Glazer v. Formica Corp., 964 F.2d 149, 157 (2d Cir. 1992)); In re Marsh & McLennan Cos., Inc. Sec. Litig., 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006). When the defendant's disclosure duty arises in this fashion, the concepts of materiality and duty, though technically distinct, see Glazer, 964 F.2d at 156, "coalesce." Time Warner, 9 F.3d at 267. Thus, if "there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available," that omitted fact is material, Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (internal quotation marks and citation omitted), and gives rise to a duty to disclose, see Time Warner, 9 F.3d at 268 ("If a reasonable investor would . . . regard the omitted fact [as "having significantly altered the total mix of information made available"], it is difficult to imagine a circumstance where the [affirmative] statement would not be rendered misleading in the absence of the disclosure.") (internal quotation marks and citation omitted); In re Marsh & McLennan Cos. Sec. Litig., 04 Cv. 8144 (SWK), 2007 WL 3407064, at *7 (S.D.N.Y. Nov. 14, 2007) (describing circumstances under which duty to disclose arises).
    Here, the SAC plausibly alleges that the omission of reference to the Sex Minigame, alongside Take-Two's assertion that it complied with the ESRB's rating requirements, rendered that assertion misleading. (SAC ¶¶ 235, 261, 273.) Furthermore,

Lead Plaintiffs identify a second allegedly false statement in Take-Two's 2004 and 2005 Forms 10-K, couched in the terms of an opinion: "We believe that we comply with [the ESRB's] rating systems and properly display the ratings and content descriptions received for our titles." (SAC ¶¶ 215, 222, 227, 233, 240, 247, 252, 259.) A statement of opinion is actionable only "if the speaker does not genuinely and reasonably believe it or if it is without a basis in fact." In re IBM Corp. Sec. Litig., 163 F.3d 102, 109 (2d Cir. 1998). Thus, whereas the Court's discussion of Take-Two's asserted compliance with the ESRB's rules trained on the veracity vel non of that assertion, the Court's inquiry into the Company's stated belief in its compliance with the ESRB's rules focuses on the genuineness and reasonableness of that belief. As elaborated above, there was reason for Take-Two to believe that the ESRB's rules did not require the disclosure of the Sex Minigame. In particular, the

---

the SAC avers that the presence of the Sex Minigame, if properly disclosed to the ESRB, would have caused GTA:SA to receive an "AO" rating (SAC ¶¶ 133-35), which would have effectively precluded sales of GTA:SA in some of its largest distribution channels (SAC ¶ 130). Given the importance of GTA:SA to the financial well-being of Take-Two (SAC ¶ 20), a reasonable investor would have found it highly relevant that the game included wrapped content that, according to the SAC, would affect its rating and consequently, its marketability, if disclosed in accordance with the ESRB's rules. Hence, Lead Plaintiffs have alleged an actionable omission insofar as they aver that Take-Two should have disclosed the presence of the Sex Minigame at the time it asserted that it "label[ed] and market[ed its] products in strict accordance with [ESRB] principles and guidelines" (SAC ¶¶ 232, 258).

ESRB's rules omitted reference to wrapped content, though such reference might naturally have been made alongside mention of "Easter eggs" and "cheat codes." See, e.g., VKK Corp., 244 F.3d at 130 (internal citations omitted). Furthermore, some of the ESRB's pronouncements suggest that the entity changed its policy to require the disclosure of wrapped content only in response to the GTA:SA scandal. (See, e.g., Lee Decl. Ex. 8.) Under these circumstances, Take-Two's professed belief in its compliance with the ESRB's rules was not without a basis in fact.

Moreover, for largely the same reasons discussed in the Court's scienter analysis in Part II.A.1.iii, the SAC fails to allege sufficient facts to impugn the genuineness and reasonableness of Defendants' belief in Take-Two's compliance with the ESRB's rules. As set forth in the FTC Complaint, "the ESRB's published requirements did not state that relevant content included unused textures ('skins') in the game software or content in the game code that was inaccessible and unplayable without modifying the code." (Lee Decl. Ex. 1, FTC Compl. ¶ 10.) As such, the ESRB's published requirements were at the very least silent with respect to that issue. The SAC, however, fails to allege the existence of sources of information other than the ESRB's published requirements from which Defendants might have inferred the content of the ESRB's disclosure rules as they pertained to the Sex Minigame. Under these circumstances, Lead

Plaintiffs have failed to aver adequately that the defendants were disingenuous or unreasonable in "believing" that Take-Two had complied with the ESRB's rules. Thus, whether or not Take-Two's non-disclosure of the Sex Minigame constituted a violation of the ESRB's rules, Lead Plaintiffs have failed to allege an actionable misstatement or omission with respect to Take-Two's stated belief in its compliance with the ESRB's rules.

In summary, Lead Plaintiffs have plausibly alleged a false statement in Take-Two's 2004 and 2005 Forms 10-K, insofar as those disclosures assert, "We label and market our products in strict accordance with [ESRB] principles and guidelines." (SAC ¶¶ 232, 258.) However, Lead Plaintiffs have failed to aver an actionable misleading statement or omission inasmuch as they rely upon Take-Two's profession, "We believe that we comply with [the ESRB's] rating systems and properly display the ratings and content descriptions received for our titles." (SAC ¶¶ 215, 222, 227, 233, 240, 247, 252, 259.)[9]

---

[9] Defendants argue (Take-Two GTA:SA Mot. Dismiss 15-16) that liability may not be predicated upon Take-Two's statements concerning its compliance with the ESRB's rating requirements because those statements were made in a larger context that bespoke caution. See, e.g., San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 811 (2d Cir. 1996) (citation omitted). Here, Take-Two's relevant public disclosures, including its 2004 Form 10-K, cautioned that retailers might "decline to sell [products] containing graphic violence or sexually explicit material," and that groups might "target [Take-Two's] 'M' rated titles." (Lee Decl. Ex. 10, at 30.) Although this language may have warned investors of

ii. **The Alleged Misleading Statement in Take-Two's 2004 and 2005 Forms 10-K Is Attributable to Defendants Take-Two, Eibeler, Winters, Emmel, Flug, and Grace**

Having held that the SAC adequately alleges a materially misleading statement in Take-Two's 2004 and 2005 Forms 10-K, the Court must now ascertain to whom the SAC adequately attributes that misleading statement. In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 641 (S.D.N.Y. 2007) ("When fraud is alleged against multiple defendants, a plaintiff must set forth separately the acts complained of by each defendant.") (internal quotation marks, alterations, and citation omitted); In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319, 330 (S.D.N.Y. 2004) ("[I]n cases brought under Rule 10b-5(b), defendants can only be held liable for statements that are publicly attributed to them.") (citing Wright v. Ernst & Young, LLP, 152 F.3d 169 (2d Cir. 1998)); see also ATSI Commc'ns, 493 F.3d at 99 (stating that securities fraud complaint must identify, inter alia, the alleged maker of a false statement). There is no dispute that the allegedly false statement in Take-

---

potential regulatory, legislative, and political eventualities that would affect the marketability of Take-Two's products, it did not disclose, either explicitly or impliedly, the risk upon which Lead Plaintiffs have based their claims, i.e., the risk that Take-Two would misrepresent the content of its games to the ESRB and thereby obtain improper ratings. Thus, Defendants may not take sanctuary within the confines of the "bespeak caution" doctrine. See, e.g., Hunt v. Alliance N. Am. Gov't Income Trust, Inc., 159 F.3d 723, 728-29 (2d Cir. 1998) (refusing to apply "bespeak caution" doctrine where risk disclosed was not that of which plaintiffs complained).

Two's 2004 and 2005 Forms 10-K, concerning the company's compliance with the ESRB's rules, is attributable to Take-Two. Furthermore, this allegedly false statement is attributable to defendants Eibeler, Winters, Emmel, Flug, and Grace, who, according to Lead Plaintiffs' averments (SAC ¶¶ 229, 255), signed the company's 2004 and 2005 Forms 10-K. See In re Marsh & McLennan Cos. Sec. Litig., 501 F. Supp. 2d 452, 479 (S.D.N.Y. 2006).

In addition, Lead Plaintiffs claim that Brant should be held liable for the alleged misrepresentation in Take-Two's 2004 and 2005 Forms 10-K under the group pleading doctrine, and that Rockstar, Donovan, and Houser (collectively, the "Rockstar Defendants") should be held liable under a limited exception for subsidiary liability. (Pls.' Opp'n 71-73.) For the reasons that follow, the Court rejects these contentions and holds that the SAC has alleged insufficient facts attributing the alleged misstatement in Take-Two's 2004 and 2005 Forms 10-K to defendants Brant, Rockstar, Donovan, and Houser.

### a. The Group Pleading Doctrine Does Not Apply to Brant

The doctrine of group pleading establishes a limited exception to the general rule that a plaintiff must directly link individual defendants to particular alleged misstatements in order to state a claim under Section 10(b) and Rule 10b-5. See In re Refco, 503 F. Supp. 2d at 641; Pension Comm. of the

Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC., 446 F.
Supp. 2d 163, 180 (S.D.N.Y. 2006) (citation omitted). Under the
group pleading doctrine, a court may presume that certain group-
published documents, including annual reports, are attributable
to corporate insiders involved in the everyday affairs of the
company. In re Marsh & McLennan, 501 F. Supp. 2d at 479
(internal quotation marks and citation omitted).[10] "For
statements to be attributable to [an individual defendant], the
Complaint must allege that the statements were made at a time
when the particular defendant held a high level position
indicating that he was an insider, with direct involvement in
day-to-day affairs, at the entity issuing the statement." In re
Alstom SA Sec. Litig., 406 F. Supp. 2d 433, 449 (S.D.N.Y. 2005).

---

[10] Although at least three circuit courts have questioned
the continuing vitality of the group pleading doctrine in the
wake of the PSLRA, see, e.g., Winer Family Trust v. Queen, 503
F.3d 319, 337 (3d Cir. 2007); Makor Issues & Rights, Ltd. v.
Tellabs, Inc., 437 F.3d 588, 602-03 (7th Cir. 2006); Southland
Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 364
(5th Cir. 2004), the majority of courts in this District has
determined that the doctrine survived the PSLRA's enactment, In
re Marsh & McLennan, 501 F. Supp. 2d at 479. See generally Sarah
S. Gold & Richard L. Spinogatti, Group Pleading Suffers Another
Blow, N.Y.L.J., Dec. 12, 2007, at 3, 9 (reporting various
appellate decisions rejecting group pleading in wake of PSLRA,
but noting that "majority rule" in Southern District of New York
holds that group plead is still viable) (internal quotation
marks and citation omitted). This Court is not persuaded that it
should deviate from its prior acceptance of the doctrine of
group pleading, In re Marsh & McLennan, 501 F. Supp. 2d at 479;
In re AOL Time Warner, Inc. Sec. & "ERISA" Litig., 381 F. Supp.
2d 192, 220 (S.D.N.Y. 2004), even in light of the Third
Circuit's recent ruling in Winer, 503 F.3d at 337.

Here, the SAC contains some allegations concerning Brant's high-level position at Take-Two (SAC ¶ 281), his knowledge of the Sex Minigame (SAC ¶ 307), and his control over Take-Two's SEC filings (SAC ¶ 283). Nevertheless, the group pleading doctrine's presumption of responsibility cannot apply to Brant because the SAC, taken as a whole, fails to allege that Brant possessed the requisite insider status at the time that Take-Two's 2004 and 2005 Forms 10-K were issued.

The SAC avers that Brant resigned from his position as Chairman and CEO of Take-Two in March 2004. (SAC ¶ 42.) The SAC also alleges that Brant entered into a consent decree with the SEC in June 2005, which, <u>inter alia</u>, barred him from serving as an officer or director of a public company during the ensuing five years. (SAC ¶ 42.) Furthermore, the SAC indicates that Brant held only the position of Vice President of Publishing from March 2004 until October 16, 2006. (SAC ¶ 42.) Take-Two's SEC filings describe this position as "non-executive." (Brant Mot. Dismiss, Declaration of Edward M. Spiro ("Spiro Decl.") Ex. 3, at 6.)[11] Thus, during the very period of time in which Take-Two issued the allegedly misleading statement in its 2004 and 2005 Forms 10-K, Brant occupied a non-executive position at the

---

[11] On a motion to dismiss, the Court may properly consider "legally required public disclosure documents filed with the SEC." <u>ATSI Commc'ns</u>, 493 F.3d at 98.

company, and was barred by consent decree from acting as an officer or director of any public company.

According to the SAC, Brant's mission as Vice President of Publishing was to develop Take-Two's portfolio of proprietary brands, a task that required the maintenance of close working relationships with defendants Houser and Donovan. (SAC ¶ 304.) The SAC also alleges that defendant Houser voiced strong objections to the removal of the Sex Minigame from GTA:SA's code in an e-mail, dated August 17, 2004, and addressed to Brant. (SAC ¶ 137.) This allegation gives rise to an inference that Brant was involved in the development of GTA:SA and, perhaps, in the decision to wrap the Sex Minigame in GTA:SA's code. Nevertheless, this allegation provides little reason to conclude that Brant controlled Take-Two's disclosures regarding the company's compliance with the ESRB's rules. Likewise, the SAC's averment that Brant was the highest paid member of Take-Two's management in 2004, despite his resignation from the Chairman and CEO positions (SAC ¶¶ 42, 306), sheds little light upon his specific job responsibilities, including his authority to influence and control Take-Two's filings with the SEC.

Given the position Brant occupied at the time Take-Two issued its 2004 and 2005 Forms 10-K, and in light of Lead Plaintiffs' failure to allege specific facts concerning Brant's actual authority to influence the Company's public disclosures,

32

the Court finds unreasonable the presumption that Brant was responsible for the content of Take-Two's SEC filings. See In re Alstom SA, 406 F. Supp. 2d at 467 & n.31 (indicating that titles of Senior Vice President and Vice President of Finance did not, without more, indicate authority necessary to hold such individuals liable for corporation's statements). The Court therefore declines to apply the group pleading doctrine to him. See Pension Comm. of the Univ. of Montreal Pension Plan, 446 F. Supp. 2d at 180. As there is no other basis for attributing to Brant the alleged misstatement in Take-Two's 2004 and 2005 Forms 10-K, that statement is not properly attributed to him.

### b. The Exception for Subsidiary Liability Does Not Apply to the Rockstar Defendants

In certain narrow circumstances, a subsidiary and its senior officers may be held liable for misstatements appearing in the parent company's public disclosures. For example, this Court held that a subsidiary may be found liable when the relevant statements by the parent company are "uniquely within the subsidiary's knowledge and control." In re Marsh & McLennan, 501 F. Supp. 2d at 480 (citation omitted). Under different circumstances, courts in this District have found that a subsidiary may be held liable for statements of its parent when the "subsidiary provides false or misleading financial information to a parent, knowing that the information will be

communicated to investors." In re Alstom, 406 F. Supp. 2d at 464; see also In re LaBranche Sec. Litig., 405 F. Supp. 2d 333, 351-52 (S.D.N.Y. 2005); In re Kidder Peabody Sec. Litig., 10 F.Supp.2d 398, 407 (S.D.N.Y. 1998).

Here, the SAC avers that Rockstar develops video games for publication and sale by Take-Two, and that an entity affiliated with Rockstar created GTA:SA. (SAC ¶ 39.) The SAC also alleges that the Rockstar Defendants knew that the Sex Minigame should have been disclosed to the ESRB, and that Take-Two had misrepresented its compliance with the ESRB's rules. (SAC ¶ 302.) On the basis of these allegations, Lead Plaintiffs argue that subsidiary liability applies to the Rockstar Defendants. (Pls. Opp'n 71-72.) The Court disagrees.

Although Lead Plaintiffs allege that the Rockstar Defendants knew the content of Take-Two's public disclosures concerning its compliance with the ESRB's rules (SAC ¶ 302), the SAC avers no facts tending to show that the Rockstar Defendants had control over the information disclosed by Take-Two. Thus, the "knowledge and control" branch of subsidiary liability is inapposite. Cf. In re Marsh & McLennan 501 F. Supp. 2d at 480 (applying doctrine where senior management officials at subsidiary actually participated in drafting parent's SEC filings and had control over the content of such filings). Moreover, the SAC is devoid of factual allegations showing that

the purported false statements in Take-Two's 2004 and 2005 Forms 10-K originated in previous intentional falsehoods propagated by the Rockstar Defendants. Therefore, the "propagation of knowing falsehoods" branch of subsidiary liability is also inapplicable in this case. Cf. In re Alstom, 406 F. Supp. 2d at 464 (allowing subsidiary liability where subsidiary communicated misleading information to parent knowing that it would be incorporated in parent's public statements). Under these circumstances, the Rockstar Defendants may not be held liable for the alleged misstatement in Take-Two's 2004 and 2005 Forms 10-K.

In sum, the SAC has averred sufficient facts to attribute responsibility for the alleged false statement in Take-Two's 2004 and 2005 Forms 10-K to defendants Take-Two, Eibeler, Winters, Emmel, Flug, and Grace. However, the SAC insufficiently attributes responsibility to defendants Brant, Rockstar, Donovan, and Houser.

### iii. The SAC Fails to Allege Scienter with Respect to All Defendants

To state a claim for a violation of Rule 10b-5, plaintiffs must aver particular facts giving rise to a strong inference that the defendants acted with the requisite scienter, i.e., with the "intent to deceive, manipulate or defraud." Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001) (internal quotation marks and citation omitted); see also 15 U.S.C. § 78u-4(b)(2)

(setting forth PSLRA's "strong inference" requirement). An inference of scienter may be predicated upon "facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI Commc'ns, 493 F.3d at 99 (citing Ganino v. Citizens Utils. Co., 228 F.3d 154, 168-69 (2d Cir. 2000)). That inference is "strong," however, only if it is cogent and at least as plausible as nonculpable explanations for the defendant's conduct. Tellabs, 127 S. Ct. at 2510. For the reasons that follow, the Court finds that the SAC fails to allege sufficient facts giving rise to an inference of scienter with respect to any defendant other than Winters. Moreover, with regard to defendant Winters, whatever inference of scienter may be drawn in Lead Plaintiffs' favor is not "strong," within the meaning of the PSLRA. Thus, the Court holds that Lead Plaintiffs have not adequately pleaded that any defendant acted with the requisite scienter.

### a. The SAC Inadequately Pleads Scienter With Respect to Brant, Houser, and Donovan

Although the Court has already determined that the misstatements in Take-Two's 2004 and 2005 Forms 10-K are not attributable to defendants Brant, Houser, and Donovan, see supra Part II.A.1.ii, it nonetheless addresses the scienter allegations made against these defendants in order to inform the

parties' arguments concerning Lead Plaintiffs' anticipated motion to amend the SAC. Lead Plaintiffs claim that they have pleaded scienter with respect to Brant, Houser, and Donovan by way of adequate "motive and opportunity" allegations, or, alternatively, through sufficient averments constituting strong circumstantial evidence of conscious misbehavior or recklessness. (Pls.' Opp'n 65-70, 72-76.) Upon close inspection, however, Lead Plaintiffs' allegations are far too general to give rise to an inference of scienter under either theory.

### (1) The SAC Insufficiently Alleges That Houser, Donovan, and Brant Possessed a Motive to Commit Fraud

To allege motive, a complaint must identify "concrete benefits that could be realized by one or more of the false statements and wrongful disclosures alleged." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994); see also Novak, 216 F.3d at 311 (indicating that pre-PSLRA case law applying "motive and opportunity" test should inform post-PSLRA scienter inquiry). These concrete benefits must inure to particular defendants in a "personal way." Novak, 216 F.3d at 307. Thus, "[m]otives that are generally possessed by most corporate directors and officers do not suffice . . . ." Kalnit, 264 F.3d at 139.

Here, Lead Plaintiffs aver that defendants Houser, Donovan, and Brant realized that GTA:SA would receive a rating of "AO" if

the Sex Minigame was included as part of normal game play (SAC ¶¶ 133-38), as initially intended. These defendants were also aware that deletion of the Sex Minigame "would have required additional testing and delayed launch of the game." (SAC ¶ 139.) Such additional testing entailed further costs (SAC ¶ 140), and any significant delay in the launch of the GTA:SA would have pushed the game's release date into 2005, thereby severely curtailing revenues for 2004. (SAC ¶ 308.) Thus, the SAC posits that these defendants wrapped the Sex Minigame and fraudulently concealed that act in order to avoid the negative marketing consequences of an "AO" rating (SAC ¶ 130), evade the additional costs resulting from further testing, and ensure a release date during the 2004 fiscal year. (SAC ¶¶ 308-09.)

Accepting as true this rendition of the pertinent facts, the Court nonetheless finds that Lead Plaintiffs have failed to allege that defendants Houser, Donovan, and Brant possessed a cognizable motive to commit fraud. The desire to improve a company's year-end financial numbers is essentially identical to the "motive to maintain the appearance of corporate profitability," which does not give rise to inference of scienter. Chill v. Gen. Elec. Co., 101 F.3d 263, 268 (2d Cir. 1996). Because the SAC is devoid of additional allegations establishing a concrete, personal benefit to defendants Houser,

Donovan, and Brant, Lead Plaintiffs have failed to allege that these defendants possessed a motive to commit fraud.[12]

> **(2)  The SAC Alleges Insufficient Circumstantial Evidence of Knowledge or Recklessness With Respect to Brant, Houser, and Donovan**

A securities fraud plaintiff may also predicate an inference of scienter upon circumstantial evidence of conscious or reckless misbehavior, such as allegations that the defendants "knew facts or had access to information suggesting that their public statements were not accurate." Novak, 216 F.3d at 311;

---

[12] Lead Plaintiffs' motive allegations with respect to defendants Houser, Donovan, and Brant are also rather implausible. Cf. Kalnit, 264 F.3d at 140-41 (dismissing plaintiff's motive allegations in part because they were "nonsensical" and defied economic reason). In particular, if the failure to disclose the Sex Minigame clearly violated the ESRB's rules (SAC ¶ 301), and if the Sex Minigame contained "AO" content (SAC ¶¶ 133-37) that would inevitably be discovered (SAC ¶ 166), the alleged misrepresentation of Take-Two's compliance with the ESRB's rules could only have achieved "a short respite from an inevitable day of reckoning," Shields, 25 F.3d at 1130. It seems farfetched that defendants Houser, Donovan, and Brant would commit fraud to secure such an ephemeral benefit. See id.

Lead Plaintiffs argue, nonetheless, that Defendants hoped "that regulators and investors would not become aware of the deceit or respond vigorously to it" (Pls.' Opp'n 65), and that Defendants believed "they would be able to manage the risk of adverse consequences with the ESRB" (Pls.' Opp'n 66). These claims are undermined by Lead Plaintiffs' own averments. First, Defendants' purported hope that "regulators and investors would not become aware of the deceit" is nonsensical if, as Lead Plaintiffs aver, Defendants knew that the discovery and widespread dissemination of the Sex Minigame was inevitable (SAC ¶ 166). Second, Defendants' purported belief that regulators would not "respond vigorously to [their deceit]" and that "they would be able to manage the risk of adverse consequences with the ESRB" seems unfounded if, as Lead Plaintiffs allege, Defendants knew that they had "clearly" violated the ESRB's rules (SAC ¶ 301).

see also <u>In re Carter-Wallace, Inc., Sec. Litig.</u>, 220 F.3d 36, 39 (2d Cir. 2000) (plaintiffs may satisfy "conscious misbehavior" theory by alleging "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it") (internal quotation marks and citation omitted). Nevertheless, where, as here, a "motive is not apparent . . . , the strength of the circumstantial allegations must be correspondingly greater." <u>Kalnit</u>, 264 F.3d at 142 (internal quotation marks and citation omitted).

In the instant case, Lead Plaintiffs' circumstantial scienter allegations rest upon three foundational allegations: First, defendants Brant, Houser, and Donovan knew that <u>GTA:SA</u>'s code contained the Sex Minigame, and that such content was properly rated "AO." (SAC ¶¶ 133-35.) Second, these defendants knew and intended that the Sex Minigame would become widely available. (SAC ¶ 166.) Third, Brant, Houser, and Donovan knew that the ESRB's rules required disclosure of the wrapped Sex Minigame. (SAC ¶ 301.) For the reasons that follow, however, the SAC contains insufficient factual allegations to support the last two of these averments. Most importantly, though Lead Plaintiffs have plausibly alleged that the ESRB's rules required disclosure of the Sex Minigame, Lead Plaintiffs have failed to

advance sufficient averments tending to show that Brant, Houser, and Donovan knew that the ESRB mandated such disclosure. Lacking factual allegations showing that these defendants knew that the Sex Minigame should have been disclosed to the ESRB, the SAC has not alleged strong circumstantial evidence that defendants Brant, Houser, and Donovan engaged in knowing misconduct or were reckless.

As an initial matter, the Court notes that Lead Plaintiffs have adequately alleged facts showing that defendants Brant, Houser, and Donovan knew that the wrapped Sex Minigame was present in GTA:SA's code, and that the Sex Minigame contained "AO" content. Specifically, the SAC quotes from various e-mails exchanged by Brant, Houser, and Donovan in August 2004, which discussed the Sex Minigame and the ESRB's rating process. (SAC ¶¶ 133-42.)

Nevertheless, the SAC fails to allege sufficient facts to support an inference that defendants Brant, Houser, and Donovan knew the discovery of the Sex Minigame was inevitable. When read in the light most generous to Lead Plaintiffs, the SAC's factual allegations at most give rise to the inference that defendants Brant, Houser, and Donovan knew that modders would search for hidden content in GTA:SA. For example, the SAC alleges that these defendants were aware that modding is a "mainstream phenomenon" (SAC ¶¶ 145-46) encouraged by the GTA:SA official

website (SAC ¶¶ 147-49). The SAC also avers that modders would likely devote thousands of hours to locating unlockable activities and features in GTA:SA's code (SAC ¶ 156), and that a knowledgeable programmer could easily unlock such activities or features once they were located (SAC ¶ 157). These allegations, however, do not beget the pertinent inference that Brant, Houser, and Donovan knew that modders would actually locate the Sex Minigame.

Lead Plaintiffs' expert, Independent Security Evaluators LLC ("ISE"), also fails to support this inference. Indeed, although ISE opined that the discovery of the Sex Minigame was inevitable (SAC ¶ 159), ISE also stated that it could not determine how difficult it would be for a modder to locate the Sex Minigame, because it lacked authorization to disassemble GTA:SA's code (SAC ¶ 152). Moreover, ISE expressly indicated that it could not speak to Defendants' state of mind. (SAC ¶ 160.) Under these circumstances, ISE's opinion does not support an inference that Brant, Houser, and Donovan knew that the discovery of the Sex Minigame was inevitable.

Lead Plaintiffs' reliance on the rapid discovery of the Sex Minigame (SAC ¶ 162) is similarly misplaced. This allegation, though marginally relevant, cf. In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 72 (2d Cir. 2001) (indicating that courts may rely on pre-class period data and post-class period data, as

well as any other information that sheds light on relevant
issues), bears the hallmarks of impermissible pleading of "fraud
by hindsight," Novak, 216 F.3d at 309 (internal quotation marks
and citation omitted). The appearance of the "Hot Coffee" mod
shortly after the release of the PC version of GTA:SA says
little about any individual defendant's knowledge, at a date
several months earlier, that this would occur. See Novak, 216
F.3d at 309 ("Corporate officials need not be clairvoyant; . . .
allegations that defendants should have anticipated future
events and made certain disclosures earlier than they actually
did do not suffice to make out a claim of securities fraud.")
(citations omitted). In light of the foregoing, Lead Plaintiffs
have failed to allege sufficient facts showing that Brant,
Houser, and Donovan knew that the discovery of the Sex Minigame
was inevitable.

Most importantly, Lead Plaintiffs have failed to allege
adequate facts demonstrating that defendants Brant, Houser, and
Donovan knew that the ESRB's rules required disclosure of the
wrapped Sex Minigame. As the Court has already determined, see
supra Part II.A.1.i, the SAC plausibly alleges that the ESRB in
fact mandated the disclosure of all pertinent game content,
including wrapped content. Nonetheless, the Court's prior
analysis demonstrates that there was, at the very least,
significant ambiguity in the ESRB's treatment of wrapped

43

content. For instance, the ESRB's rules did not make reference to wrapped content, although the ESRB required that other forms of hidden content, such as content unlocked through the use of cheat codes and "Easter eggs," be disclosed. (Lee Decl. Ex. 1, FTC Compl. ¶ 10.) Moreover, the ESRB announced a <u>new</u> policy expressly requiring the disclosure of wrapped content only after the re-rating of <u>GTA:SA</u>. (Lee Decl. Ex. 8.) Given the evident ambiguity in the ESRB's rules, Lead Plaintiffs' mere allegation that Take-Two violated the ESRB's rules does not give rise to a strong inference that Brant, Houser, and Donovan <u>knew</u> that Take-Two had violated those rules. <u>See, e.g.</u>, <u>See In re Yukos Oil</u>, 2006 WL 3026024, at *20 (alleged violation of Russian law did not support inference of scienter where defendant's interpretation of such law was reasonable in light of prevailing case law); <u>In re Bristol-Myers Squibb Sec. Litig.</u>, 312 F. Supp. 2d 549, 567 (S.D.N.Y. 2004) (in light of complexity of relevant accounting principle, mere misapplication of such principle did not show scienter); <u>Funke v. Life Fin. Corp.</u>, 237 F. Supp. 2d 458, 468-69 (S.D.N.Y. 2002) (ambiguities in accounting principle defeated Lead Plaintiffs' attempt to predicate scienter upon simple violation of rule).

Because Lead Plaintiffs allege no grounds for concluding that Brant, Houser, and Donovan knew that the ESRB required the disclosure of wrapped content other than the ESRB's ambiguous

rules themselves, Lead Plaintiffs have failed to allege sufficient facts showing that these defendants knew the wrapped Sex Minigame was subject to mandatory disclosure. In light of the foregoing analysis, the SAC's circumstantial case for scienter rests solely upon its allegation that Brant, Houser, and Donovan knew that the Sex Minigame was wrapped into GTA:SA's code. Such knowledge, however, did not contradict Take-Two's representation in its 2004 and 2005 Forms 10-K that it complied with the ESRB's rules. In the absence of allegations that Brant, Houser, and Donovan were in possession of, or had access to, information that contradicted Take-Two's public disclosures-- such as information more decisively showing that the ESRB required the divulgation of wrapped content--Lead Plaintiffs have failed to plead facts giving rise to an inference that these defendants acted with scienter.[13]

### b. The SAC Inadequately Pleads Eibeler's Scienter

The SAC advances both motive and opportunity, and circumstantial evidence allegations in support of Eibeler's scienter. For many of the same reasons discussed in the Court's treatment of defendants Brant, Houser, and Donovan, however,

---

[13] Because Lead Plaintiffs have failed to allege sufficient facts either showing that Brant, Houser, and Donovan possessed a motive to commit fraud, or constituting strong circumstantial evidence of knowing or reckless misconduct, the Court finds no occasion to determine whether the inference proposed by Lead Plaintiffs is "strong," in light of competing, nonculpable explanations for these defendants' conduct.

Lead Plaintiffs have not alleged a cognizable motive for, or sufficient circumstantial evidence of, Eibeler's alleged fraud.

### (1) The SAC Insufficiently Alleges That Eibeler Possessed a Motive to Commit Fraud

Lead Plaintiffs aver that Eibeler had motive to inflate Take-Two's revenues at the close of 2004 because his compensation was tied to the company's revenues. (SAC ¶ 310.) Accordingly, the SAC posits that Eibeler would have wanted to covertly wrap the Sex Minigame in order to prevent GTA:SA from receiving an "M" rating and avoid the additional costs and delay inherent in the full-scale deletion of the Sex Minigame from GTA:SA's code. (SAC ¶¶ 130, 308.) Nevertheless, Eibeler's purported desire to increase his incentive compensation by maximizing Take-Two's year-end earnings may not, as a matter of law, form the basis for Lead Plaintiffs' scienter allegations. Ferber v. Travelers Corp., 785 F. Supp. 1101, 1107 (D. Conn. 1991) ("[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated."); see also Acito v. IMCERA Grp., Inc., 47 F.3d 47, 54 (2d Cir. 1995) (holding that motive cannot be predicated upon allegations that defendants inflated company's share price in order to augment their compensation); In re Mercator Software, Inc. Sec. Litig., 161 F. Supp. 2d 143, 148-49 (D. Conn. 2001) (ruling that desire to maintain corporation's profitability and increase executive

compensation did not support finding of motive upon which strong inference of scienter could be premised). Because Lead Plaintiffs have failed to allege anything other than a generalized motive to profit through increased incentive compensation,[14] they have failed to allege that Eibeler possessed a cognizable motive to commit fraud.

### (2) The SAC Alleges Insufficient Circumstantial Evidence of Eibeler's Knowledge or Recklessness

Lead Plaintiffs' circumstantial scienter allegations with respect to Eibeler rest upon two separate foundations. First, Lead Plaintiffs contend that "the crucial importance of [GTA:SA] to Take-Two provides strong circumstantial evidence that Eibeler was aware of the fraud." (Pls.' Opp'n 74.) Second, Lead Plaintiffs apparently group Eibeler with other executive

---

[14]    The SAC does not expressly attribute a generalized corporate profitability motive to Eibeler, though it does aver generally that, "[t]o avoid delaying the launch of "GTA:SA" and incurring additional cost, . . . Defendants took a shortcut" (SAC ¶ 140). Given the particularity requirement embedded in Federal Rule of Civil Procedure 9(b) and the PSLRA, this generalized allegation arguably should not be read to apply to Eibeler, especially because it is most naturally read as referring to defendants Brant, Houser, and Donovan, who are mentioned in the preceding and following paragraphs. Nonetheless, even if the corporate profitability motive is added to Eibeler's alleged incentive compensation motive, Lead Plaintiffs have not satisfied the "motive and opportunity" test, for these two generalized, patently insufficient motives do not sum to a cognizable motive. Cf. Tellabs, 127 S. Ct. at 2516 (Alito, J., concurring) (opining that, under PSLRA, "'a strong inference' of scienter must arise from those facts that are stated 'with particularity.' It follows that facts not stated with the requisite particularity cannot be considered in determining whether the strong-inference test is met.").

officers at Take-Two who allegedly knew that the Sex Minigame contained "AO" content and was present in GTA:SA's code; that the Sex Minigame would inevitably be discovered; and that the wrapped Sex Minigame was subject to mandatory disclosure under the ESRB's rules. (Pls.' Opp'n 68-70.)

As an initial matter, Lead Plaintiffs' attempt to group Eibeler with other executives at Take-Two is patently insufficient. In particular, the SAC's allegations concerning certain defendants' knowledge of the Sex Minigame mention only Brant, Houser, and Donovan, not Eibeler. (SAC ¶¶ 133-38.) Moreover, even if these allegations properly ascribe knowledge of the Sex Minigame to Eibeler, they provide an insufficient foundation for a strong inference of scienter as the Court determined supra, in Part II.A.1.iii.a(2).

Lead Plaintiffs' attempt to premise Eibeler's scienter upon GTA:SA's importance to the company is similarly fruitless. Knowledge of facts relevant to a company's "core business" operations may at times be imputed to key corporate officers. See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2006). Here, the SAC alleges that sales of GTA:SA accounted for 20.9% of Take-Two's revenues in fiscal year 2004 and approximately 31% in fiscal year 2005. Under these circumstances, it may be appropriate to impute to Eibeler knowledge of certain basic facts concerning GTA:SA,

48

which were known to at least some Take-Two and Rockstar employees, including the existence of the wrapped Sex Minigame. Nevertheless, the scienter inquiry focuses principally upon the knowledge or recklessness of individual defendants, not upon their corporate roles. See In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d 367, 381 (S.D.N.Y. 2004) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)); see also In re LaBranche, 405 F. Supp. 2d at 360-61 (holding that generalized allegations concerning a defendant's corporate role are ordinarily insufficient for scienter purposes). The SAC is devoid of particularized allegations tending to show that Eibeler knew that the ESRB required the disclosure of wrapped content, or that Eibeler had access to information that would have clarified this disclosure requirement. Indeed, the Court has already determined that defendants Brant, Houser, and Donovan, who were intimately involved in the creation of GTA:SA and in ensuring compliance with the ESRB's rules (SAC ¶¶ 133-38), are not properly charged with knowledge that the ESRB required the disclosure of wrapped content. See supra Part II.A.1.iii.a(2). Under these circumstances, the Court will not impute to Eibeler knowledge of the actual content of the ESRB's ambiguous rules regarding the disclosure of wrapped content. Therefore, Lead Plaintiffs have not alleged sufficient circumstantial evidence to give rise to a strong inference that

49

Eibeler possessed the requisite scienter in relation to Take-Two's allegedly false assertion of compliance with the ESRB's rules.[15]

### c. The SAC Inadequately Pleads Scienter With Respect to Emmel, Flug, and Grace

The SAC purports to plead scienter with respect to defendants Emmel, Flug, and Grace largely through motive and opportunity allegations. Specifically, Lead Plaintiffs allege that defendants Emmel, Flug, and Grace misrepresented Take-Two's compliance with the ESRB's rating requirements in order to inflate Take-Two's share price so that they could effect profitable stock sales. (SAC ¶¶ 311-14.) A defendant's motive to perpetrate fraud may be established by allegations that the defendant made "unusual" insider sales at a time when he withheld material information from the investing public. See In re Scholastic, 252 F.3d at 74. Nevertheless, for the reasons that follow, the alleged insider sales perpetrated by Emmel, Flug, and Grace were not so "unusual" as to establish these defendants' motive to commit fraud.

"Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales,

---

[15] As Lead Plaintiffs have failed to allege sufficient facts either showing that Eibeler possessed a motive to commit fraud, or constituting strong circumstantial evidence of knowing or reckless misconduct, there is no occasion to determine whether the inference proposed by Lead Plaintiffs is "strong," in light of competing, nonculpable explanations for Eibeler's conduct.

the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." Id. at 74-75. The timing of insider stock sales may also be a relevant consideration. See, e.g., In re AXIS Capital Holdings, Ltd. Sec. Litig., 456 F. Supp. 2d 576, 596 (S.D.N.Y. 2006) ("Timing is more typically an indicia of fraud where sales occur shortly after insiders allegedly learn undisclosed adverse information or made affirmative misrepresentations, or shortly before corrective disclosures are made in the market.") (citations omitted); Ressler v. Liz Claiborne, Inc., 75 F. Supp. 2d 43, 60 (E.D.N.Y. 1998) (holding that significant time lapse between stock sales and disclosure of false statements undermined inference of scienter).

The SAC avers that Emmel sold 7,070 shares of Take-Two stock in mid-March 2005, for proceeds of $289,870; Flug sold 28,324 shares of Take-Two stock in April, June, and July 2005, for proceeds of $906,416; and Grace sold 300,000 shares of Take-Two stock in mid-June, for proceeds totaling $8,439,775. (SAC ¶ 313.) A finding of motive, however, cannot be predicated solely upon the gross proceeds of alleged insider stock sales. In re eSpeed, Inc. Sec. Litig., 457 F. Supp. 2d 266, 290 (S.D.N.Y. 2006). Here, the SAC fails to specify the amount of profit Emmel, Flug, and Grace garnered through their sales; what percentage of their total stockholdings these sales constituted;

and the volume of these defendants' insider sales during the relevant period of time as compared to other periods. In the absence of such or similar allegations, the SAC fails to allege facts tending to show that the sales by Emmel, Flug, and Grace were so unusual as to give rise to an inference of scienter.[16] See, e.g., Malin v. XL Capital Ltd., 499 F. Supp. 2d 117, 151 (D. Conn. 2007) (holding that it was "impossible" to determine whether stock sales were unusual in timing and amount where plaintiffs only provided information concerning the number of shares sold, the share price on the date of sale, and the gross profit realized); In re eSpeed, 457 F. Supp. 2d at 290 (ruling that motive allegations were insufficient because complaint, inter alia, failed to specify profit garnered through defendants' stock sales).

Moreover, the Court's own review of the Take-Two's SEC filings reveals no grounds for finding that the relevant stock sales by Emmel, Flug, and Grace were sufficiently unusual to support an inference of scienter. See Malin, 499 F. Supp. 2d at 151 (citing In re Sina Corp. Sec. Litig., 05 Cv. 2154 (NRB), 2006 WL 2742048, at *11-*12 (S.D.N.Y. Sept. 26, 2006), for proposition that court may take judicial notice of corporate SEC

---

[16] Indeed, Lead Plaintiffs may concede their failure to allege that Emmel, Flug, and Grace acted with the requisite scienter, inasmuch as their opposition brief does not address these defendants' state of mind with respect to the GTA:SA Fraud. (See Pls.' Opp'n 65-76.)

filings to review trading activity of company's officers and directors). Take-Two's SEC filings reveal that Grace did not sell any of his directly held shares during the pertinent time period, though he did sell some 300,000 shares held by an entity called Anglo American. (Flug & Grace Mot. Dismiss, Declaration of Aaron S. Foldenauer ("Foldenauer Decl.") Exs. C, D, & E.) The SAC is devoid of allegations explaining Grace's relationship to Anglo American, including most importantly, his decision-making authority, if any, over that entity's stock sales. Moreover, the record reveals that Grace made other large sales of Take-Two securities in September 2003, before the alleged misstatements regarding GTA:SA were made. See Grace SEC Form 4, Sept. 10, 2003. The SAC, however, fails to address the "unusualness" of Grace's June 2005 sales in light of these substantial, and ostensibly unsuspicious, September 2003 sales. Flug and Emmel sold less than 20% of their total stockholdings during the relevant time period. (Foldenauer Decl. Ex. E; see also SAC ¶ 313.) Furthermore, Flug made similar sales of Take-Two stock in June 2003, see Flug SEC Forms 4, July 3, 2003), and Emmel made larger sales of Take-Two stock in September 2003, see Emmel SEC Form 4, Sept. 5, 2003, long before the alleged publication of misstatements regarding GTA:SA. The SAC makes no attempt to demonstrate that the pertinent sales by Flug and Emmel were

53

unusual, given their relatively small size, and the occurrence
of similar sales during seemingly innocuous periods of time.

Under these circumstances, and given Lead Plaintiffs'
failure to allege facts demonstrating that the sale of stock by
Emmel, Flug, and Grace was in any way "unusual," the Court finds
that Lead Plaintiffs have failed to plead motive with respect to
these defendants. See, e.g., Malin, 499 F. Supp. 2d at 153
(holding that sales of 6.83%, 14.42%, and 30.84% of total
stockholdings were not unusual); In re eSpeed, 457 F. Supp. 2d
at 291 (holding that sales of 10.9% and 17.4% of holdings were
not unusual); In re KeySpan Corp. Sec. Litig., 383 F. Supp. 2d
358, 382-83 (E.D.N.Y. 2003) (holding that sales of less than 20%
of total stockholdings were not unusual).[17] Therefore, Lead

---

[17] Lead Plaintiffs apparently do not rely upon a
circumstantial evidence theory to plead scienter with regard to
Emmel, Flug, and Grace. Such reliance would not in any event
bear fruit. The SAC contains no specific factual allegations
tending to show that Emmel, Flug, and Grace knew of the presence
of the Sex Minigame in GTA:SA's code. Moreover, because these
defendants were not "key" corporate officers of Take-Two, but
rather, members of the company's board of directors, such
knowledge may not be imputed to them under the "core business"
theory. See In re Forest Labs, Inc. Derivative Litig., 450 F,
Supp. 2d 379, 390-91 (S.D.N.Y. 2006) ("While it is true that (in
the securities fraud context) knowledge of facts critical to the
continued viability of major transactions or 'core' business
operations have been imputed to a company and its 'key' or 'top'
officers, there is no authority to support the attribution of
knowledge to Outside Directors who are not alleged to be
directly involved in the day-to-day operations of the company.")
(internal citations omitted). As the SAC does not even allege
adequate facts showing that Emmel, Flug, or Grace knew of the
Sex Minigame or the decision to wrap it, the SAC necessarily

Plaintiffs have failed to allege facts giving rise to an inference that Emmel, Flug, and Grace acted with scienter.[18]

### d. The SAC Inadequately Pleads Winters's Scienter

Lead Plaintiffs also rely upon CFO Winters's alleged insider stock sales in order to demonstrate that he possessed the "motive and opportunity" to commit fraud. For the reasons that follow, Lead Plaintiffs have minimally alleged sufficient motive and opportunity allegations to support an inference that Winters acted with scienter. Nevertheless, the Court holds that this inference is not "strong," within the meaning of the PSLRA, because it is not as compelling as competing, nonculpable explanations for Winters's conduct.

### (1) The SAC Adequately Alleges Winters's Motive and Opportunity to Commit Fraud

As an initial matter, the Court notes, and Winters apparently concedes, that he possessed the opportunity to commit fraud through the exercise of his powers as Take-Two's CFO during the relevant time period. _See, e.g._, _In re GeoPharma, Inc. Sec. Litig._, 411 F. Supp. 2d 434, 441 (S.D.N.Y. 2006) (presuming that corporate officers possess opportunity to commit

---

fails to plead that these defendants engaged in knowing misconduct or recklessness with respect to Take-Two's statement that it complied with the ESRB's rules.

[18] Given Lead Plaintiffs' failure to allege facts supporting an inference that Emmel, Flug, and Grace acted with scienter, the Court need not determine whether the inference proposed by Lead Plaintiffs is "strong," in light of competing, nonculpable explanations for these defendants' conduct.

fraud). With respect to Winters's motive, the SAC avers that he sold 112,000 shares of Take-Two stock on March 12, 2005, for proceeds of $4,459,439, and 50,000 shares of Take-Two stock on June 14, 2005, for proceeds of $1,438,500. (SAC ¶ 311.) The SAC also alleges that these sales represented 85% of Winters's holdings during the Class Period. (SAC ¶ 312.) Lead Plaintiffs aver that these allegations give rise to a strong inference of scienter. (SAC ¶ 314.)

Lead Plaintiffs' allegations respecting Winters's motive suffer from some of the same deficiencies that characterize their allegations with respect to Emmel, Flug, and Grace. In particular, the SAC fails to specify the actual profits, as opposed to total proceeds, of Winters's sales. Moreover, the SAC neglects to contrast Winters's stock sales during the Class Period with sales he made during other comparable periods of time. These deficiencies notwithstanding, Lead Plaintiffs' motive allegation with respect to Winters are minimally sufficient to give rise to an inference of scienter. In reaching this conclusion, the Court relies upon two principal considerations that separate Winters on the one hand from Emmel, Flug, and Grace on the other. First, the Court's review of Take-Two's SEC filings reveals that Winters, unlike Emmel, Flug, and Grace, sold far more shares during the Class Period than he sold during previous time periods, see, e.g., Winters SEC Form 4,

Sept. 5, 2003 (reporting sale of 10,000 shares); Winters SEC Form 4, Oct. 12, 2004 (reporting sale of 5,000 shares). Second, and most significantly, the SAC alleges that Winters sold 85% of his holdings during the Class Period (SAC ¶ 312), but makes no similar allegation with respect to Emmel, Flug, and Grace. Under these circumstances, and although the SAC's motive allegations with respect to Winters are not without their shortcomings, Lead Plaintiffs have advanced sufficient factual allegations to establish Winters's motive to commit fraud. See, e.g., In re Scholastic, 252 F.3d at 75 (holding that plaintiffs adequately pleaded scienter through allegations that defendant sold over 80% of his holdings during few-day period, after long period without any sales whatsoever). Therefore, Lead Plaintiffs' factual allegations give rise to an inference that Winters possessed the requisite scienter to commit securities fraud.

### (2)    The SAC's Proposed Inference of Scienter Is Not as Compelling as Competing Nonculpable Explanations

Although Lead Plaintiffs have pleaded facts giving rise to an inference of scienter, the Court must nonetheless determine whether that inference is "strong," in light of competing, nonculpable explanations for Winters's conduct. Tellabs, 127 S. Ct. at 2510. Here, Winters contends that the most compelling inference arising from the facts alleged is that he did not know

of the Sex Minigame or that its inclusion in <u>GTA:SA</u>'s code violated the ESRB's rules, and sold his stock for reasons having nothing to do with the "Hot Coffee" mod. (Winters Reply 7-8.) As explained in greater detail below, the Court agrees largely with Winters's position. Even assuming <u>arguendo</u> that Winters may be charged, under a "core business" theory, with knowledge of the existence of the Sex Minigame, <u>see</u> <u>In re Atlas</u>, 324 F. Supp. 2d at 489, Lead Plaintiffs' proposed culpable inference is less compelling than the inference that Winters was unaware of Take-Two's alleged noncompliance with the ESRB's rules.

Lead Plaintiffs' allegations of Winters's motive are significantly attenuated. First, Lead Plaintiffs do not allege the amount of profit garnered by Winters through the stock sales in question, nor do they contrast the volume of Winters's sales during the Class Period with his sales during other comparable periods of time. Even if such allegations are not strictly necessary, their omission weakens Lead Plaintiffs' "strong inference" claim.

Second, the alleged conduct of other defendants to this action undercuts Lead Plaintiffs' motive allegations. For instance, Take-Two's CEO, defendant Eibeler, actually acquired 50,000 shares of Take-Two stock, <u>see</u> Eibeler SEC Form 4, June 16, 2005, at nearly the same time that Winters allegedly engaged in insider sales (SAC ¶ 312). Furthermore, as the Court

58

determined <u>supra</u>, Part II.A.1.iii.c, defendants Emmel, Grace, and Flug did not engage in unusual insider sales during the Class Period. Likewise, Lead Plaintiffs have failed to allege that the defendants most intimately involved in the development of <u>GTA:SA</u>, <u>i.e.</u>, defendants Brant, Houser, and Donovan (<u>see, e.g.</u>, SAC ¶¶ 133-41), owned or sold any shares of Take-Two stock during the Class Period.[19] These considerations, taken in the aggregate, cast doubt upon Lead Plaintiffs' averments concerning Winters's alleged motive to commit fraud. <u>See, e.g.</u>, <u>San Leandro Em. Med. Grp. Profit Sharing Plan v. Philip Morris Cos.</u>, 75 F.3d 801, 814 (2d Cir. 1996) ("[T]he fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive."); <u>Malin</u>, 499 F. Supp. 2d at 153 (holding that defendant CEO's sale of only 6.83% of his shares during relevant period undermined inference of scienter with respect to other defendants); <u>In re</u>

---

[19] Lead Plaintiffs contend that their failure in this respect does not weaken their claims because "public reporting of transactions by insiders is limited to specified categories of individuals." (Pls.' Opp'n 66.) Lead Plaintiffs therefore claim that, until they have taken discovery, they cannot be expected to allege facts concerning the stock sales or stock ownership of defendants Brant, Houser, and Donovan. (Pls.' Opp'n 66.) The Court is sympathetic to Lead Plaintiffs' dilemma. Nevertheless, Lead Plaintiffs bear the burden of alleging facts that give rise to a strong inference that Winters acted with scienter. The absence of allegations concerning the stock sales and stock ownership of Brant, Houser, and Donovan undermines the persuasiveness of Lead Plaintiffs' scienter allegations with respect to Winters.

eSpeed, 457 F. Supp. 2d at 291 (holding that complete absence of sales by two of four defendants during relevant period undercut inference of scienter with respect to two defendants who sold shares); In re KeySpan, 383 F. Supp. 2d at 383-84 (holding that CEO's failure to make stock sales during one of two alleged "sell-off" periods attenuated inference of scienter as to other defendants).

Third, the timing of Winters's stock sales weakens Lead Plaintiffs' showing of motive. The alleged false statement upon which Lead Plaintiffs attempt to predicate Winters's liability was first made in Take-Two's Form 10-K (SAC ¶232), which was filed with the SEC on December 22, 2004 (SAC ¶ 229). The falsity of that statement was allegedly publicized on July 20, 2005, when Take-Two announced that the ESRB had concluded its investigation and had decided to change GTA:SA's rating from "M" to "AO." (SAC ¶¶ 314, 320.) Nevertheless, the bulk of Winters's sales during the intervening period of time occurred on March 11, 2005, when he sold 112,000 shares of Take-Two stock, for net proceeds of approximately $4.5 million. (SAC ¶ 311.) These figures represent nearly 70% of the total shares that Winters sold during the relevant time period, and more than 75% of the total proceeds received from those sales. (SAC ¶ 311.) The lapsing of nearly three months between Take-Two's issuance of the alleged false statement and the lion's share of Winters's

stock sales, and of approximately four months between these substantial sales and the revelation of the alleged falsity, inescapably attenuates any inference of scienter that may be drawn in Lead Plaintiffs' favor. See In re AXIS, 456 F. Supp. 2d at 595-96; Frazier v. Vitalworks, Inc., 341 F. Supp. 2d 142, 161-62 (D. Conn. 2004) (holding that insider trading was not so suspicious as to give rise to inference of scienter because most trading took place in spring, at time far removed from October revelation of falsehoods); In re KeySpan, 383 F. Supp. 2d at 385 (ruling, inter alia, that passage of four to six weeks between alleged false statement and sales negated inference that defendants were attempting to "reap the immediate benefit of" false statement) (citation omitted); Ressler, 75 F. Supp. 2d at 60 (holding that six-month gap between issuance of majority of false statements and insider trading undercut inference of scienter).

Winters's other stock sales during the relevant time period occurred on June 14, 2005, nearly six months after the alleged false statement appeared in Take-Two's 2004 Form 10-K, and over one month before the alleged falsity of that statement was revealed to the market. Although these sales transpired closer in time to the announcement of GTA:SA's re-rating than did the March 11 sales, they were much smaller in number of shares sold and proceeds received, thereby undermining their relevance to

the motive analysis. <u>See</u> <u>Frazier</u>, 341 F. Supp. 2d at 161-62 (holding that insider sales were not unusual where bulk of sales occurred at time several months before revelation of falsity, and only comparatively smaller sales occurred at time closer to revelation). Moreover, Lead Plaintiffs' attempts to explain why Winters would have been motivated to sell on June 14, 2005, more than a month before the alleged falsity in Take-Two's 2004 10-K came to light, are unpersuasive. Specifically, Lead Plaintiffs refer to an e-mail received by defendant Donovan on June 10, 2005, which reported discussion of the "Hot Coffee" mod on a modder website. (SAC ¶ 314.) Nevertheless, Lead Plaintiffs fail to allege that this e-mail, or its contents, ever reached any Take-Two employee, let alone Winters. Nor do Lead Plaintiffs explain why knowledge of an e-mail received by an officer of Rockstar should be imputed to an officer of that company's parent, Take-Two. The same may be said for the e-mail written by Houser on June 14, 2005, which concerns the wrapping of the Sex Minigame. (SAC ¶ 141.)

Furthermore, the long passage of time between the issuance of Take-Two's 2004 Form 10-K and Winters's June 14 sales undermines the cogency of Lead Plaintiffs' scienter allegations. Insider sales are relevant to the motive analysis because they may show that the defendant had reason to make a false statement, <u>i.e.</u>, that the defendant made a false statement in

order to inflate stock prices so that he could profit from stock sales. See In re Scholastic, 252 F.3d at 74. Although Winters's stock sales in June 2005 may be probative of what he knew or believed about Take-Two at that time, they reveal comparatively little about Winters's state of mind six months earlier, when he allegedly issued a false statement in Take-Two's Form 10-K. See In re KeySpan, 383 F. Supp. 2d at 385; Ressler, 75 F. Supp. 2d at 60.

Given the holes in Lead Plaintiffs' motive allegations, the alleged conduct of other defendants to this action, and the timing of Winters's stock sales, Lead Plaintiffs have put forward only an attenuated case for Winters's motive. As such, the inference of scienter Lead Plaintiffs ask the Court to draw therefrom is correspondingly attenuated as well.

Against Lead Plaintiffs' tenuous showing of Winters's scienter, the Court must weigh nonculpable explanations for his conduct. As previously discussed, see supra Part II.A.1.iii.a, the ESRB's rules regarding the submission of wrapped conduct were significantly ambiguous. This ambiguity counsels against a culpable reading of Winters's--or any other defendant's-- actions. That is, Take-Two's representation that it complied with the ESRB's rules is most plausibly understood as a reasonable, though perhaps ultimately mistaken, interpretation of ambiguous rules.

Indeed, Lead Plaintiffs' allegations undermine any sinister reading of Winters's conduct. In particular, the SAC avers that Defendants wrapped the Sex Minigame in order to prevent GTA:SA from receiving an "AO" rating, while also avoiding delay and additional costs. (SAC ¶¶ 133-36; 139-40.) The SAC also clarifies that "wrapping" makes relevant code "inaccessible" during regular game play. (SAC ¶ 140.) Absent an averment that wrapping is anything but an ordinary programming technique, or an averment that modders previously had unlocked wrapped content in other video games, Lead Plaintiffs' allegations suggest only that the Sex Minigame was wrapped primarily for legitimate business motives, and in an effort to ensure compliance with the ESRB's rules. On this more plausible theory, Winters represented in Take-Two's Forms 10-K that the company had complied with the ESRB's rules because reasonable steps had been taken to ensure that Take-Two did so comply.

Therefore, the most compelling interpretation of the facts alleged is that Winters represented that Take-Two had complied with the ESRB's rules because that was either the literal truth, or an eminently reasonable interpretation of the events that had occurred. As such, Lead Plaintiffs have failed to plead facts giving rise to a strong inference that Winters acted with scienter.

### e. The SAC Inadequately Pleads Scienter With Respect to Take-Two and Rockstar

A corporation's scienter necessarily derives from the state of mind of its employees. See In re Marsh & McLennan, 501 F. Supp. 2d at 481 (citing Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 101 (2d Cir. 2001)). Nevertheless, "[t]o carry their burden of showing that a corporate defendant acted with scienter, plaintiffs in securities fraud cases need not prove that any one individual employee of a corporate defendant also acted with scienter. Proof of a corporation's collective knowledge and intent is sufficient." In re Worldcom, Inc. Sec. Litig., 352 F. Supp. 2d 472, 497 (S.D.N.Y. 2005). Here, Lead Plaintiffs have not adequately alleged scienter with respect to any of the individual defendants. See supra Part II.A.1.iii.a-d. Although this failure is not dispositive of Take-Two's or Rockstar's scienter, Lead Plaintiffs have nonetheless failed to plead scienter with respect to the corporate defendants for many of the same reasons that they have failed to plead the individual defendants' scienter.

Most importantly, Lead Plaintiffs' allegations fail to give rise to an inference that Take-Two and Rockstar employees, individually or collectively, were aware that wrapped content was subject to mandatory disclosure, or were reckless with respect to that alleged fact. Although the fiction of

"collective knowledge" permits the conclusion that Take-Two and Rockstar knew of the wrapped Sex Minigame in GTA:SA's code, that knowledge did not contradict--or even undermine--Take-Two's statement that it had complied with the ESRB's rating requirements. Indeed, Lead Plaintiffs have failed to allege that any of the contemporaneous information available to Take-Two and Rockstar employees, including the ESRB's rules themselves, contradicted Take-Two's statement that it had complied with the ESRB's rules. On the pleadings before the Court, Take-Two's statement that it complied with the ESRB's rules is most naturally interpreted as a reasonable resolution of ambiguous regulatory language, not as a reckless or knowing falsehood. This is especially true because Take-Two and Rockstar stood to gain very little from the fraud alleged by Lead Plaintiffs, other than the postponement of "an inevitable day of reckoning" when the Sex Minigame became public. Shields, 25 F.3d at 1130; see also supra note 12. Under these circumstances, the Court is constrained to hold that Lead Plaintiffs have failed to plead facts giving rise to a strong inference that Take-Two and Rockstar acted with scienter.

In summary, Lead Plaintiffs have failed to aver facts giving rise to a strong inference of scienter with respect to any defendant allegedly involved in the GTA:SA Fraud. Thus,

Count I of the SAC is dismissed insofar as it is based on the GTA:SA Fraud.

## 2. The Options Backdating Fraud

In their motions to dismiss, Defendants challenge Lead Plaintiffs' allegations with respect to the Options Backdating Fraud on several grounds.[20] First, Defendants argue that Lead Plaintiffs have not made sufficient loss causation allegations. Second, Defendants claim that the alleged misstatements underlying the Options Backdating Fraud were not material. Third, various individual defendants, including Eibeler, Winters, Emmel, Flug, and Grace, contend that Lead Plaintiffs have failed to plead scienter.[21] For the reasons set forth below, the Court holds that Lead Plaintiffs have adequately alleged loss causation and materiality. Moreover, the Court finds that Lead Plaintiffs have properly pleaded scienter with respect to

---

[20] The SAC does not mention the Rockstar Defendants in its allegations respecting the Options Backdating Fraud. Thus, the Court assumes that Lead Plaintiffs do not seek recovery from Rockstar, Houser, or Donovan in connection with that alleged fraud. In any event, the SAC's options backdating averments are obviously deficient with respect to these defendants, and thus subject to dismissal.

[21] Defendants Emmel, Flug, and Grace also maintain that Lead Plaintiffs have not individually attributed any allegedly false statement to them. Nevertheless, because several of the alleged false statements underlying the Options Backdating Fraud appeared in Take-Two's Forms 10-K, many of which were signed by these defendants (SAC ¶¶ 188, 206, 229, 255), Lead Plaintiffs have properly attributed at least some false statements to Emmel, Flug, and Grace, see In re Marsh & McLennan, 501 F. Supp. 2d at 479.

defendants Brant, Emmel, Flug, Grace, and Take-Two, but not with respect to any other defendant.

### i. The SAC Sufficiently Pleads Loss Causation Only as to the July 10 Disclosure of SEC's Informal Investigation

To state a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must, inter alia, plead loss causation. See Lentell, 396 F.3d at 172 (quoting First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769 (2d Cir. 1994)). Loss causation may not be predicated merely upon averments that the defendant's misrepresentations inflated the purchase price of the underlying securities. Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 347 (2005). Instead, a plaintiff can plead loss causation only by alleging that the defendant's misstatements or omissions "concealed something from the market that, when disclosed, negatively affected the value of the security." Lentell, 396 F.3d at 173. In their "simplest form," such loss causation allegations connect the diminution in stock prices to a particular corrective disclosure, "which revealed an alleged misstatement's falsity or disclosed that allegedly material information had been omitted." In re AOL Time Warner, Inc. Sec. Litig., 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007) (citing Lentell, 396 F.3d at 175).

Here, Lead Plaintiffs identify two alleged corrective disclosures concerning Take-Two's options backdating, which were

followed by significant negative market reactions. First, on June 26, 2006, Take-Two disclosed that it had received grand jury subpoenas from the Manhattan District Attorney's Office regarding "certain compensation and human resources documents" and "activities of the Company's Board of Directors and Committees thereof" (the "June 26 Disclosure"). (Pls.' Opp'n 27; see also SAC ¶ 324.) Second, on July 10, 2006, Take-Two revealed that it had received notice that the SEC was "conducting an informal non-public investigation into certain stock option grants made by the Company from January 1997 to the present" (the "July 10 Disclosure"). (Pls.' Opp'n 27-28; see also SAC ¶ 325.) Lead Plaintiffs have adequately linked the July 10 Disclosure to a significant diminution in the price of Take-Two common stock, but have failed to do so with respect to the June 26 Disclosure. Thus, the Court finds that Lead Plaintiffs have pleaded loss causation only in relation to the July 10 Disclosure.

### a. Loss Causation May Not Be Predicated upon the June 26 Disclosure

In order to form an adequate basis for loss causation, a given disclosure need not emanate from a particular source, "take a particular form[,] or be of a particular quality." In re Winstar Commc'ns, 01 Cv. 3014, 01 Cv. 11522 (GBD), 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006). Thus, loss causation

69

may be predicated upon brief, publicly-disclosed, third-party analyses of a company's financials, which contradict representations made by defendants. Id. at *15. Loss causation may also be grounded in disclosures couched as opinions, or in other statements that are not "verifiably truthful" at the time they are made. Id. Furthermore, loss causation may be premised on partial revelations that do not uncover the complete extent of the falsity of specific prior statements. See In re Motorola Sec. Litig., 505 F. Supp. 2d 501, 533 (N.D. Ill. 2007).

Nevertheless, a particular disclosure constitutes a sufficient foundation for loss causation allegations only if it somehow reveals to the market that a defendant's prior statements were not entirely true or accurate. See, e.g., In re eSpeed, 457 F. Supp. 2d at 297 ("Dura imposed no requirement that corrective disclosures emanate from the company itself, so long as the truth is disclosed in some fashion.") (emphasis added); In re Worldcom, Inc. Sec. Litig., 02 Cv. 3288 (DLC), 2005 WL 375314, at *6 (S.D.N.Y. Feb. 17, 2005) ("A concealed fact cannot cause a decrease in the value of a stock before the concealment is made public."). That is, the disclosure must possess a sufficient nexus to a prior misstatement such that it reveals at least part of the falsity of that misstatement. See, e.g., In re AOL Time Warner, 503 F. Supp. 2d at 679 ("Without providing a nexus between the alleged fraud and their losses,

70

either by demonstrating the materialization of a concealed risk or the existence of a corrective disclosure, the plaintiffs fail to plead loss causation . . . ."); cf. Dura, 544 U.S. at 347 (a complaint must provide "some indication of the loss and the causal connection that the plaintiff has in mind") (emphasis added). Here, because the June 26 Disclosure was insufficiently linked to Take-Two's earlier misrepresentations regarding its options-granting process, that disclosure cannot form an adequate basis for Lead Plaintiffs' loss causation allegations.

On June 26, 2006, Take-Two announced that it had received grand jury subpoenas from the Manhattan District Attorney's Office requesting the production of documents that pertained to:

> the knowledge of the Company's officers and directors regarding the creation, inclusion and programming of hidden scenes (commonly referred to as "hot coffee") in [GTA:SA], the submission of [GTA:SA] to the [ESRB] for a rating, and the Company's disclosures regarding hot coffee; disclosures and presentations by the Company of certain events, including acquisitions, partnering arrangements and earnings results; invoices from, payments to, and termination of PricewaterhouseCoopers LLP and retention of Ernst & Young LLP; acquisitions by the Company in 2005; certain compensation and human resources documents with respect to the Company and certain of its current and former officers and directors; and documents concerning the activities of the Company's Board of Directors and Committees thereof.

71

(Wohl Decl. Ex. 5.)[22] The only references in this announcement that arguably relate to Take-Two's prior statements regarding its options-granting process are those made to "certain compensation and human resources documents" and to "documents concerning the activities of the Company's Board of Directors and Committees thereof." The announcement makes no mention of options, options backdating, or the manner in which Take-Two accounted for its options grants. Therefore, on its face the June 26 Disclosure did not cure or undermine Defendants' past misrepresentations concerning Take-Two's options grants. That is, the language of the June 26 Disclosure did not provide investors with enough information to conclude even that the Manhattan District Attorney's Office would be investigating Take-Two's options-granting process, let alone that the company's prior statements regarding that process were in some way false. See Payne v. DeLuca, 433 F. Supp. 2d 547, 609 (W.D. Pa. 2006) (holding that plaintiffs inadequately pleaded loss causation because "the content of the press release would not [have] alerted investors that the Company had been perpetrating a fraudulent scheme").

---

[22] As this press release is quoted in full as an exhibit to Lead Plaintiffs' Opposition Memorandum and is referenced in the SAC (¶ 324), the Court may rely upon it in deciding Defendants' motions to dismiss. See Ayerst Labs., 850 F.2d at 910 n.3.

In this regard, the present case is distinguishable from the principal case upon which Lead Plaintiffs rely, <u>In re Bradley Pharmaceuticals</u>. In that case, the plaintiffs alleged that the defendant corporation had entered into a "sham" sale of Deconamine Syrup in order to boost its revenues. <u>In re Bradley Pharms., Inc. Sec. Litig.</u>, 421 F. Supp 2d 822, 824 (D.N.J. 2006). Several months after the alleged sale, the corporation announced that the SEC had requested certain revenue recognition documents in furtherance of an informal investigation of violations of the federal securities laws. <u>Id.</u> at 824-25. The court held that the plaintiffs' allegation that the defendant corporation's share price dropped 26% after this announcement was sufficient to plead loss causation. <u>Id.</u> at 828.

The SEC's announced investigation in <u>In re Bradley Pharmaceuticals</u> dealt with the same subject matter--albeit, more generally--as did the alleged fraud, i.e., the defendant corporation's revenue recognition. <u>See</u> <u>In re Motorola</u>, 505 F. Supp. 2d at 548 (discussing <u>In re Bradley Pharmaceuticals</u>). Here, there is a more distant relationship between the subject of the Manhattan District Attorney's announced investigation-- Take-Two's general compensation practices--and the subject of the alleged fraud--Take-Two's options-granting practices. Moreover, the SEC's announced investigation in <u>In re Bradley Pharmaceuticals</u> expressly involved violations of the federal

73

securities laws, which obviously called into question the defendants' prior representations. 421 F. Supp. 2d at 824-25. The announced investigation in the instant case, however, made no mention of securities law violations, nor does an investigation by the Manhattan District Attorney's Office invariably involve prior public misrepresentations. Thus, the nexus between the disclosure and alleged fraud in this case is more tenuous than that in In re Bradley Pharmaceuticals.

Lead Plaintiffs attempt to bolster their loss-causation allegations by noting one analyst's observation, shortly after the Manhattan District Attorney's Office made its document request, that the "request could be a look at the Company's stock option activities." (Wohl Decl. Ex. 6.)[23] That same analyst, however, stated that "[i]t's unclear what the District Attorney is looking for exactly considering the wide ranging variety of the requested documentation . . . ." (Wohl Decl. Ex. 6.) Moreover, Lead Plaintiffs have not alleged that any other analysts or investors expressly drew a connection between the Manhattan District Attorney's investigation and Take-Two's

---

[23] The analyst's report was not referenced in the SAC, nor is there any evidence that Lead Plaintiffs relied upon the report in drafting the SAC or in bringing suit. Nevertheless, the Court may take judicial notice of the fact of the report's publication, which may constitute evidence of how the investing public understood the June 26 Disclosure. See In re Alstom SA, 406 F. Supp. 2d at 408-09 (indicating that court may take judicial notice of newspaper articles for fact of their publication and for other relevant purposes).

options practices. Given the guarded terms of this analyst's solitary conjecture concerning the possible subject of the Manhattan District Attorney's investigation, Lead Plaintiffs have not plausibly alleged that the June 26 Disclosure revealed to the market any part of the falsity of Take-Two's prior representations regarding its options grants. Cf. Dura, 544 U.S. at 346-347 (finding complaint's loss causation allegations inadequate because they failed to identify significant drop in share price "after the truth became known").

For the same reason, the Court finds unpersuasive Lead Plaintiffs' contention that it is irrelevant how investors understood the June 26 Disclosure at the time of its issuance, because it is undisputed that the Grand Jury investigation announced therein came to focus exclusively upon options backdating (Pls.' Opp'n 31). The relevant inquiry for loss causation purposes is whether the disclosure in question made some part of a previously undisclosed truth known. Dura, 544 U.S. at 346-47; Lentell, 396 F.3d at 173 (to establish loss causation, plaintiffs must allege "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security") (emphasis added). Thus, the pertinent inquiry trains on the most plausible understanding of a given disclosure at the time it was made. That the Manhattan District Attorney's investigation came

75

to focus on Take-Two's options backdating has little bearing on whether the June 26 Disclosure revealed undisclosed information concerning the Company's options-granting practices.

In light of the foregoing considerations, investors could not plausibly have understood the June 26 Disclosure to reveal any part of the falsity of Defendants' alleged misrepresentations concerning Take-Two's option-granting practices. Indeed, the primary thrust of the June 26 Disclosure centers on the Manhattan District Attorney's request for documents related to the GTA:SA Fraud, not the Options Backdating Fraud. Cf. Weiss v. Amkor Tech., Inc., 527 F. Supp. 2d 938, 947 (D. Ariz. 2007) (holding that plaintiff did not adequately plead loss causation in part because primary focus of pertinent disclosure was topic other than alleged fraud). Therefore, although Take-Two's share price dropped 15% following the June 26 Disclosure (SAC ¶ 324), Lead Plaintiffs have not adequately alleged that any of this precipitous decline is attributable to the Options Backdating Fraud. To be sure, a plaintiff may plead loss causation without alleging a disclosure that precisely mirrors the substance of a prior undisclosed fraud. See, e.g., In re Bristol-Myers Squibb Sec. Litig., 00 Cv. 1990 (SRC), 2005 WL 2007004, at * 20 (D.N.J. Aug. 17, 2005) ("Lentell cannot . . . stand for the general proposition that an alleged corrective disclosure must be the linguistic mirror

image of the alleged fraud . . . .")). Nevertheless, if a
plaintiff relies upon a particular disclosure as the basis for
his loss causation allegations, that disclosure must somehow
reveal to the market some part of the truth regarding the
alleged fraud. On the facts alleged here, the nexus between the
June 26 Disclosure and the Options Backdating Fraud is far too
tenuous to permit the inference that the former unveiled some
part of the fraudulent nature of the latter.[24]

---

[24] Defendants challenge Lead Plaintiffs' loss causation
allegations for the additional reason that the June 26
Disclosure was preceded by an article in the New York Times,
published on June 18, 2006, which specifically identified likely
recipients of backdated stock options at Take-Two, but produced
no significant negative market reaction (the "June 18 Times
Article"). See In re Merrill Lynch & Co. Research Reports Sec.
Litig., 289 F. Supp. 2d 416, 425 n.15 (S.D.N.Y. 2003) (holding
that court may take judicial notice of fact of article's
publication even if article was not attached to complaint or
incorporated therein by reference). Defendants contend that the
market's inaction in the face of the June 18 Times Article
undermines Lead Plaintiffs' loss causation allegations with
respect to the later-published and much vaguer June 26
Disclosure. (Take-Two Options Mot. Dismiss 3-4.) Lead Plaintiffs
counter that the June 18 Times Article contextualized the
capacious language of the June 26 Disclosure, providing further
grounds for an investor to conclude that the Manhattan District
Attorney's request for "certain compensation and human resources
documents" bore some relation to Take-Two's options-granting
practices. (Pls.' Opp'n 30-31.) Although the Court agrees with
Lead Plaintiffs that the June 18 Times Article does not fatally
undermine their loss causation allegations, the article provides
insufficient additional support for the SAC's loss causation
allegations to cure the deficiencies detailed above-the-line.
    A securities fraud complaint need not address the effect of
every potentially relevant disclosure upon a corporation's share
price. See, e.g., In re DRDGOLD Ltd. Sec. Litig., 472 F. Supp.
2d 562, 575-76 (S.D.N.Y. 2007) (holding that plaintiff
adequately pleaded loss causation even though initial

### b. Loss Causation May Be Predicated Upon the July 10 Disclosure

In the July 10 Disclosure, Take-Two announced that the SEC was "conducting an informal non-public investigation into

---

announcement of intention to take impairment charge did not produce negative market reaction, because subsequent specification of amount of charge produced negative reaction); In re Unumprovident Corp. Sec. Litig., 396 F. Supp. 2d 858, 899 (E.D. Tenn. 2005) (ruling that plaintiff adequately pleaded loss causation even though plaintiff did not explain market reaction to several significant events alleged in complaint). Nonetheless, a complaint's elision of significant disclosure events may bear upon the plausibility of its loss causation allegations. See, e.g., Weiss, 527 F. Supp. 2d at 947 (holding that plaintiff could not allege loss causation on basis of decline in stock price following announcement of internal investigation of options-granting practices, where stock price rose in response to eventual announcement that investigation had uncovered options backdating). Here, the June 18 Times Article addressed Take-Two's options backdating more clearly and in greater detail than did the oblique reference to "certain compensation and human resources documents" in the June 26 Disclosure. Nonetheless, the issuance of grand jury subpoenas, as announced in the June 26 Disclosure, suggests a level of certainty regarding Defendants' misdeeds that may not characterize a newspaper article such as the June 18 Times Article. See In re Openwave Sys. Sec. Litig., 528 F. Supp. 2d 236, 253 (S.D.N.Y. 2007) (indicating that court should not, on motion to dismiss, resolve question of whether informal SEC inquiry and issuance of subpoenas "are different phenomena that may exert different influences on the market price of a company's stock"). Under these circumstances, the market's non-reaction in the face of the June 18 Times Article does not render wholly implausible Lead Plaintiffs' loss-causation allegations with respect to the June 26 Disclosure.

At the same time, the June 18 Times Article provides little succor for Lead Plaintiffs' loss-causation allegations. Even in light of the "context" allegedly provided by the June 18 Times Article, investors would not plausibly have understood the June 26 Disclosure to reveal any part of the falsity of Defendants' alleged misrepresentations concerning Take-Two's option-granting practices. Thus, for the reasons stated above-the-line, the SAC fails to allege adequately that the Options Backdating Fraud caused the decline in Take-Two's share price on June 26, 2006.

certain stock option grants made by the Company from January 1997 to the present." (Wohl Decl. Ex. 8.)[25] The July Disclosure also revealed that Take-Two had commenced an internal investigation of its past options grants. (Wohl Decl. Ex. 8.) Therefore, the July 10 disclosure clearly revealed that Take-Two's options-granting practices were the subject of an investigation carried out by a governmental entity charged with ensuring compliance with the federal securities laws. Lead Plaintiffs also aver that Take-Two's share price dropped by 7.5% in response to the July 10 Disclosure. (SAC ¶ 325.) Other courts have found that similar allegations of significant stock drops in response to announced SEC investigations are sufficient to plead loss causation under the framework established by Dura and its progeny. See, e.g., In re Openwave Sys. Sec. Litig., 528 F. Supp. 2d 236, 252-53 (S.D.N.Y. 2007) (holding, inter alia, that 4.5% drop in market price of shares in response to announcement of SEC investigation into options backdating was sufficient to allege loss causation); In re Immucor Inc. Sec. Litig., 05 Cv. 2276 (WSD), 2006 WL 3000133, at *20 (N.D. Ga. Oct. 4, 2006); Lapin v. Goldman Sachs Grp., Inc., 506 F. Supp. 2d 221, 231, 243 (S.D.N.Y. 2006); In re StockerYale Sec. Litig., 453 F. Supp. 2d

---

[25] As this press release is quoted in full as an exhibit to Lead Plaintiffs' Opposition Memorandum and is referenced in the SAC (¶ 325), the Court may rely upon it in deciding Defendants' motions to dismiss. See Ayerst Labs., 850 F.2d at 910 n.3.

345, 359 (D.N.H. 2006); In re Bradley Pharms., 421 F. Supp. 2d
at 829; Brumbaugh v. Wave Sys. Corp., 416 F. Supp. 2d 239, 255-
56 (D. Mass. 2006).

Nonetheless, Defendants contend that the July 10 Disclosure
cannot form an adequate basis for Lead Plaintiffs' loss
causation allegations because it did not reveal any part of the
falsity of Take-Two's prior representations concerning its
options grants. In support of their contention, Defendants cite
In re Avista Corporation Securities Litigation, in which the
court held that the plaintiffs insufficiently pleaded loss
causation where they alleged only that the defendant
corporation's share price had dropped dramatically in response
to the announcement of a formal investigation by the Federal
Energy Regulatory Commission (the "FERC") into the defendant
corporation's electricity trades, 415 F. Supp. 2d 1214, 1220-21
(E.D. Wash. 2005). The court reasoned that the announcement of
the FERC's investigation did not reveal to the investing public
any part of the defendant corporation's alleged fraudulent
activities, but rather, signaled at most that such activities
were under investigation. Id. Significantly, the court stated,

> the announcement by a regulatory agency that it
> intends to investigate is insufficient, on its own, to
> plead loss causation. Since the orders did not reveal
> any factual information showing Avista illegally
> manipulated the energy market or made factual
> misrepresentations, the FERC Orders do not provide a
> basis for asserting a causal relationship between

Avista's alleged failure to disclose it manipulated the energy markets and Plaintiffs' alleged economic loss.

Id. at 1221.

As an initial matter, the facts of In re Avista are distinguishable from those of the instant case. Specifically, In re Avista involved an investigation carried out by the FERC, an independent federal regulatory agency charged primarily with regulating certain transactions in natural gas, oil, and electricity, and licensing certain projects involving these energy sources. See 42 U.S.C. § 7172(a). Although the FERC investigates claims of market manipulation, see, e.g. 18 C.F.R. §§ 1c.1, 1c.2 (2006); Prohibition of Energy Market Manipulation, 71 Fed. Reg. 4244-03, 4553-54 (Jan. 19, 2006) (indicating that FERC will be guided in its interpretation of energy-market manipulation rules by SEC's Rule 10b-5 jurisprudence), the announcement of a FERC investigation does not immediately call into question a company's prior representations and securities sales in the same manner as does an investigation carried out by the SEC. Moreover, the FERC's announced investigation in In re Avista did not make any mention of two of the three alleged fraudulent representations in that case. 415 F. Supp. 2d at 1220-21 (indicating that FERC's announced orders did not mention defendant's alleged change in business focus and ineffective risk management policy). With respect to these two fraudulent

representations, therefore, the facts of In re Avista are more analogous to those pertaining to the June 26 Disclosure, which did not mention Take-Two's alleged fraudulent options grants. See supra Part II.A.2.i.a.

Furthermore, insofar as In re Avista stands for the general proposition that "the announcement by a regulatory agency that it intends to investigate is insufficient, on its own, to plead loss causation," 415 F. Supp. 2d at 1221, the Court is not persuaded by that holding. Loss causation may be pleaded on the theory that the truth slowly emerged through a series of partial disclosures. See, e.g., In re Bradley Pharms., 421 F. Supp. 2d at 828-29 (citation omitted). As indicated above, various courts have found that the announcement of an SEC investigation into alleged fraudulent conduct may, for pleading purposes, constitute at least a partial disclosure of such fraudulent conduct. See, e.g., In re Openwave Sys., 528 F. Supp. 2d at 252-53; In re Immucor, 2006 WL 3000133, at *20; Lapin, 506 F. Supp. 2d at 243; In re StockerYale, 453 F. Supp. 2d at 359; In re Bradley Pharms., 421 F. Supp. 2d at 829; Brumbaugh, 416 F. Supp. 2d at 255-56. Indeed, the Court has found little support for a per se rule holding that the announcement of an SEC investigation cannot alone form the basis of loss causation allegations. For instance, in Weiss, the court found that loss causation was not adequately pleaded, but that case involved the

announcement of an internal investigation of options grants rather than the announcement an SEC investigation. 527 F. Supp. 2d at 947-48. Although Lead Plaintiffs might have bolstered their loss causation allegations--e.g., by giving some indication of the percentage of announced SEC investigations that lead to a finding of fault, or preferably, by citing to particular characteristics of the instant case that made the public more aware that a negative finding was likely to result from the SEC's inquiry--these allegations meet the bare minimum requirements established by the relevant jurisprudence.

Defendants further challenge Lead Plaintiffs' loss causation allegations with respect to the July 10 Disclosure on the basis of the movement of Take-Two's share price on other potentially relevant dates.[26] In particular, Defendants note that: (1) Take-Two's share price dropped only 2.2% in response to a preliminary report by the SC, which found improprieties in Take-Two's options-granting process and cautioned investors not to rely on Take-Two's previous financial statements (Take-Two Options Mot. Dismiss 5); (2) Take-Two's share price actually increased by 3.5% in response to its announcement that the SC had completed its investigation and had determined that the

---

[26] The Court may "take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment." Ganino, 228 F.3d at 167 n.8 (citations omitted).

company failed in many cases to issue options in accord with its stock-option plans (Take-Two Options Mot. Dismiss 5-6); (3) Take-Two's share price increased by 8.32% in response to the announcement by the Manhattan District Attorney's Office that defendant Brant had pleaded guilty to falsifying business records in connection with options backdating at Take-Two (Take-Two Options Mot. Dismiss 6); (4) Take-Two's share price decreased by only 4.2% in response to the filing of Take-Two's 2006 Form 10-K, which disclosed the results of the SC's investigation and restated financial data for the fiscal years ending October 31, 2002, 2003, 2004, and 2005 (Take-Two Options Mot. Dismiss 6); and (5) Take-Two's share price quickly recovered from any of the declines that could be attributed to the announcement of negative news concerning the Options Backdating Fraud (Take-Two Mot. Dismiss 5-6).

The reaction or non-reaction of Take-Two's share price to significant disclosure events other than those identified by the SAC may bear upon the plausibility of Lead Plaintiffs' loss causation allegations. See Weiss, 527 F. Supp. 2d at 947-48. Under the leaking-disclosure theory advanced by Lead Plaintiffs, one might have expected Take-Two's share price to decline after the announcement of the SC's final report and to Brant's guilty plea, each of which presumably disclosed some part of the Options Backdating Fraud. The contrary response of Take-Two's

84

share price to these significant events tends to undermine the plausibility of Lead Plaintiffs' loss causation allegations, inasmuch as that contrary response is inconsistent with the SAC's leaking-disclosure theory. Despite this tendency, the Court nonetheless finds that Lead Plaintiffs have pleaded a plausible theory of loss causation with respect to the July 10 Disclosure, at least at this early stage of the proceedings.

In particular, it is plausible that Take-Two's share price reacted negatively to the July 10 Disclosure of the SEC's investigation, which called into question Defendants' statements concerning Take-Two's prior options grants. (SAC ¶ 325.) According to the record before the Court, Take-Two's share price dropped again, though less markedly, on December 11, 2006, when Take-Two announced the SC's preliminary finding that there were improprieties in the company's options grants. (SAC ¶ 82.)[27] This drop is consistent with Lead Plaintiffs' leaking-disclosure theory. Given that Take-Two informed the investing public of the SC's preliminary finding on December 11, 2006, it is plausible to infer that Take-Two's share price did not react negatively to the subsequent announcements that the SC had completed its investigation on January 22, 2007, and that Brant had pleaded guilty on February 14, 2007, because the market already had

---

[27] The drop in Take-Two's share price on December 11, 2006, is not referenced in the SAC. Nevertheless, the Court may take judicial notice of this decline. Ganino, 228 F.3d at 166 n.8.

taken account of such information. See In re Bradley Pharms.,
421 F. Supp. 2d at 829 (the evolution of share price suggested
that "the market corrected the price of Bradley's stock price
when the truth began to leak out on February 28, 2005 and that
by the time Bradley announced its restatement of earnings in
April 2005, the market had already incorporated that the
previously released financial statements could not be relied
upon"). Indeed, the increase in Take-Two's share price on those
dates could reflect a positive evaluation of the self-corrective
measures employed by Take-Two and of the appearance that the
Options Backdating Fraud was behind the company after Brant's
guilty plea. Furthermore, because the rapid recovery of Take-
Two's share price from declines that it suffered may have
resulted from factors unrelated to the company's options
backdating, it is premature to preclude a showing of loss
causation on that ground. Cf. In re Electronic Arts Inc. Sec.
Litig., 05 Cv. 1219 (MMC), 2006 WL 27201, at *2 (N.D. Cal. Jan.
5, 2006).[28]

_____

    [28] In Dura, the plaintiffs alleged two significant drops in
the defendant corporation's share price. 544 U.S. at 339. With
respect to the second drop, which occurred in November 1998, the
defendant corporation's "share price temporarily fell but almost
fully recovered within one week." Id. Although the Supreme Court
ultimately found that the plaintiffs had failed to plead loss
causation, the Court did not rely upon the quick recovery of the
defendant corporation's share price in reaching that conclusion.
See id. at 347 (finding complaint's loss causation allegations
insufficient because of failure to aver that "share price fell

Defendants also challenge Lead Plaintiffs' loss causation allegations on the ground that the options-backdating scheme was fully disclosed to the market well before the July 10 Disclosure, by way of an article published in the New York Times on June 18, 2006 (the "June 18 Times Article").[29] If the truth concerning Take-Two's fraudulent options backdating had been disclosed completely prior to the July 10 Disclosure, that truth presumably would have been reflected in Take-Two's share price prior to the July 10 Disclosure, and share-price movement in response to the July 10 Disclosure would not be attributable to the revelation of the Options Backdating Fraud. See, e.g., Teachers' Ret. Sys. of La. v. Hunter, 477 F.3d 162, 187 (4th Cir. 2007) (holding that plaintiffs inadequately pleaded loss causation stemming from allegation in third party's civil complaint because, inter alia, facts alleged in complaint had already been disclosed in prior public filings). Nevertheless, speculation in the June 18 Times Article concerning possible options backdating does not necessarily constitute complete disclosure of the relevant truth regarding the Options

---

significantly after the truth became known"). Furthermore, notwithstanding the quick recovery of the defendant corporation's share price, the district court determined on remand that the plaintiffs had alleged loss causation with respect to the November 1998 stock decline. In re Dura Pharms., Inc. Sec. Litig., 452 F. Supp. 2d 1005, 1021-23 (S.D. Cal. 2006).

[29] See supra note 24 (discussing June 18 Times Article).

Backdating Fraud. It is plausible at this stage of the proceedings to infer that the July 10 Disclosure, which announced an SEC investigation, conveyed information to the investing public concerning the extent and likelihood of options backdating at Take-Two, which was not present in the June 18 Times Article. Cf. In re Openwave, 528 F. Supp. 2d at 253.

In light of the foregoing, the Court finds that the SAC adequately alleges loss causation with respect to the July 10 Disclosure. In particular, it is plausible to infer that the July 10 Disclosure revealed to the market some part of the relevant truth concerning the Options Backdating Fraud, thereby causing a decline in Take-Two's share price. Nevertheless, for the reasons set forth above, the SAC's allegations insufficiently link the June 26 Disclosure to the Options Backdating Fraud. Because it is implausible to infer that the June 26 Disclosure revealed any truth to the market about the Options Backdating Fraud, Lead Plaintiffs have not adequately alleged loss causation with respect to the June 26 Disclosure.

### ii. The SAC Adequately Alleges the Materiality of Defendants' Misstatements Regarding Options Backdating

"At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." Ganino, 228 F.3d at

88

161 (citations omitted). A complaint may be dismissed for failure to allege materiality only if the alleged misstatements "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Id. at 162 (internal quotation marks and citation omitted). Here, Lead Plaintiffs aver that the Options Backdating Fraud caused Take-Two to overstate its earnings by "20% in fiscal year 2002, 11% in fiscal year 2003, and 5-6% in fiscal years 2004 and 2005," as reflected in the restatement that appeared in Take-Two's 2006 Form 10-K. (SAC ¶ 99.) Lead Plaintiffs assert that these overstatements were material because their disclosure "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, 485 U.S. at 231-32 (citing TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).

The significant overstatement of a company's earnings may constitute a "material" misrepresentation, depending on the particular facts of the case at hand. See, e.g., Ganino, 228 F.3d at 166; Sec. & Exch. Comm. v. Penthouse Int'l, Inc., 390 F. Supp. 2d 344, 354 (S.D.N.Y. 2005); In re Kidder Peabody, 10 F. Supp. 2d at 409-12. Although the Second Circuit has counseled against the establishment of numerical benchmarks for materiality, see Ganino, 228 F.3d at 162, the 20%, 11%, and 5-6%

overstatements of earnings alleged by Lead Plaintiffs fall within the range of overstatement that other courts have found material, see id. at 166; In re Kidder Peabody, 10 F. Supp. 2d at 410 (finding statements that affected profits by 2.54% to be material). Moreover, Lead Plaintiffs allege that Take-Two's earnings reports were especially significant because: (1) "investors viewed Take-Two as a growth company, and analyzed growth trends closely" (SAC ¶ 112); (2) "the market was highly sensitive to the Company's ability to meet analysts' expectations, and any variance in revenue or earnings could have a major impact on share price if such variance caused the Company's results to fall below analysts' targets" (SAC ¶ 113); and (3) "misstatements that benefit senior management by increasing its compensation are regarded as more material because they can undermine a company's credibility in the market and present a conflict of interest" (SAC ¶ 114). These allegations, in conjunction with the sheer magnitude of the overstatement alleged in the SAC, counsel strongly in favor of a finding of materiality. Cf. Ganino, 228 F.3d at 163 (observing that misstatements in financial disclosures may be of heightened materiality when "'the misstatement hides a failure to meet analysts' consensus expectations for the enterprise'") (quoting SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150, 45152 (1999), 64 C.F.R. 45150, 45152 (1999)).

Defendants nonetheless argue that Lead Plaintiffs have failed to plead materiality. They cite precedence from the Third Circuit for the proposition that materiality should be evaluated "post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock," Oran v. Stafford, 226 F.3d 275, 282 (3d Cir. 2000), and they conclude that the movement of Take-Two's share price after relevant disclosures undermines Lead Plaintiffs' claim of materiality. (Take-Two Options Mot. Dismiss 10, 13.) The vitality of the Third Circuit's "special rule for measuring materiality in the context of an efficient securities market," Oran, 226 F.3d at 282, is a matter of significant doubt in this Circuit, see Penthouse Int'l, 390 F. Supp. 2d at 353 ("There is no requirement that stock prices fluctuate as a result of a defendant's misstatements or omissions in order for them to be material.") (internal quotation marks and citations omitted). Indeed, the Third Circuit's rule seems to contradict the Second Circuit's rejection of a "rigid formula" for evaluating materiality. Id. (citing Ganino, 228 F.3d at 162-63); see also No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp., 320 F.3d 920, 934 (9th Cir. 2003) (rejecting Oran's bright-line rule for materiality as contrary to Supreme Court's holding in Basic).[30]

_____

[30] Notwithstanding Defendants' contention to the contrary

91

Assuming, <u>arguendo</u>, that the Third Circuit's materiality jurisprudence were applicable in the instant case, Lead Plaintiffs have satisfied its dictates. In particular, as set forth in greater detail in the Court's discussion of loss causation, the SAC adequately alleges that Take-Two's share price reacted negatively to the July 10 Disclosure. <u>See supra</u> Part II.A.2.i.b. Moreover, because other factors may have caused the rapid recovery of Take-Two's share price after that initial negative reaction, Lead Plaintiffs have established a sufficient linkage between the partial revelation of the Options Backdating Fraud through the July 10 Disclosure and the stock drop on that date.

Defendants also challenge the materiality of Take-Two's overstatements of earnings on the grounds that materiality should be evaluated at the time that the falsity of these overstatements came to light, which, according to Defendants, occurred no earlier than December 11, 2006, when the company announced the need to carry out historical restatements. (Take-Two Reply 20-21.) As an initial matter, the Court is not persuaded that materiality should be evaluated from the time

---

(Take-Two Reply 20 n.15), <u>Ganino</u> did not hold that the absence of a market response to the defendant's disclosure of a misstatement was "significant evidence" of the immateriality of the statement. Instead, <u>Ganino</u> noted that the lower court had relied upon this reasoning. 228 F.3d 166 (citing <u>Ganino v. Citizens Utils. Co.</u>, 56 F. Supp. 2d 222, 227 (D. Conn. 1999)).

that Take-Two revealed to the market that it had overstated historical revenues. The language of the Supreme Court's opinion in Basic, which defines materiality as that term is used in Section 10(b) and Rule 10b-5, suggests that materiality should be analyzed at the time that the alleged misleading statement entered the market, not when its falsity was revealed, 485 U.S. at 231-32 (holding that omitted fact is material if "there [is] a substantial likelihood that [its] disclosure . . . would have been viewed by the reasonable investor as having significantly altered the total mix of information made available") (internal quotation marks and citation omitted). The Court's use of the perfect conditional tense ("would have been viewed"), rather than the conditional tense ("would be viewed"), focuses attention upon the time the disclosure should have been made, i.e., the time that the misleading statement was issued, rather than on the later time when disclosure was actually made. In other words, the Basic test proposes a counterfactual inquiry into how the market would have viewed a statement if it had been disclosed at the proper time. For this reason, the Second Circuit has concluded that "[m]ateriality is determined in light of the circumstances existing at the time the alleged misstatement occurred." Ganino, 228 F.3d at 165 (emphasis added) (citations omitted).

In any event, even if materiality were properly measured at the time that disclosure was finally made, _i.e._, in late 2006, the SAC adequately alleges a material misstatement. It is eminently plausible that a reasonable investor would have found it significant in late 2006 that Take-Two had overstated its earnings in each of the previous four years by 20%, 11%, 5%, and 6%, just as it is logical to infer that a reasonable investor would have found it significant in 2002, 2003, 2004, and 2005, as Take-Two's Forms 10-K were issued, that those financial statements overstated Take-Two's earnings by 20%, 11%, 5%, and 6%. Therefore, Lead Plaintiffs have satisfied the materiality requirement with respect to the Options Backdating Fraud.

### iii. The SAC Adequately Pleads Scienter With Respect to Take-Two, Brant, Eibeler, Emmel, Flug, and Grace

As the Court has noted, a complaint advancing claims pursuant to Section 10(b) and Rule 10b-5 must aver particular facts giving rise to a strong inference that the defendant acted with "an intent to deceive, manipulate or defraud." Kalnit, 264 F.3d at 138 (internal quotation marks and citation omitted). An inference of scienter may be predicated upon "facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI Commc'ns, 493 F.3d at 99 (quoting Ganino, 228 F.3d at 168-69). Nevertheless, such

an inference is "strong" only if it is at least as plausible as competing, nonculpable explanations for the defendant's conduct. Tellabs, 127 S. Ct. at 2510.

Here, Lead Plaintiffs have alleged sufficient facts to support an inference that Brant, Emmel, Flug, Grace, and Take-Two acted with the requisite scienter in the perpetration of the Options Backdating Fraud. With respect to the other defendants to this action, however, the SAC fails to plead scienter.

### a. The SAC Adequately Alleges Brant's Scienter

Defendant Brant does not contest the sufficiency of the SAC's allegations with respect to his scienter. The SAC alleges that Brant pleaded guilty in New York state court to falsifying business records and, in connection therewith, admitted "that he had caused Take-Two's Form 10-K for fiscal year 2002 to contain false financial statements." (SAC ¶ 42.) In light of this allegation, as well as admissions contained in Brant's plea agreement with the Manhattan District Attorney's Office (Wohl Decl. Ex. 1),[31] Lead Plaintiffs have alleged sufficient facts to give rise to a inference that Brant intentionally made false public statements concerning the Options Backdating Fraud.

---

[31] The SAC references Brant's entry of a guilty plea (SAC ¶ 42), and Lead Plaintiffs have appended a complete copy of Brant's plea agreement to their Opposition papers (Wohl Decl. Ex. 1). Therefore, that agreement is properly before the Court at this stage of the proceedings. See Ayerst Labs., 850 F.2d at 910 n.3.

Moreover, this inference is far more plausible than any other competing explanation for Brant's conduct.

### b. The SAC Adequately Alleges Scienter With Respect to Emmel, Flug, and Grace

Lead Plaintiffs rely principally upon the "motive and opportunity" test to plead the scienter of defendants Emmel, Flug, and Grace. (Pls.' Opp'n 41-43.) For the reasons that follow, the SAC contains sufficient factual allegations showing that Emmel, Flug, and Grace possessed both the motive and opportunity to perpetrate the Options Backdating Fraud. Moreover, the inference of scienter arising from Lead Plaintiffs' "motive and opportunity" allegations is at least as plausible as competing nonculpable explanations of the conduct of Emmel, Flug, and Grace. Thus, the Court holds that Lead Plaintiffs have adequately pleaded scienter with respect to these defendants.

### (1) The SAC Adequately Alleges that Emmel, Flug, and Grace Possessed Motive and Opportunity

In order to plead motive, a plaintiff "must assert a concrete and personal benefit to the individual defendants resulting from the fraud." _Kalnit_, 264 F.3d at 139 (citing _Novak_, 216 F.3d at 307-08). Here, Lead Plaintiffs allege that defendants Emmel, Flug, and Grace personally received backdated options. (SAC ¶ 92.) In support of this allegation, the SAC notes that these defendants entered into an agreement with Take-

Two to "repay" compensation they had received as a result of improperly dated options. (SAC ¶¶ 92-94.) On the record properly before the Court, defendant Emmel forfeited $171,494 through such "repayment," while defendants Flug and Grace relinquished $305,720 and $249,937, respectively.[32] (Pls.' Opp'n 9; Foldenauer Decl. Ex. B.)[33] Lead Plaintiffs assert that these defendants' receipt of backdated options, which hid hundreds of thousands of dollars in improper compensation, provided them with ample motive to commit fraud. (Pls.' Opp'n 43.) Although the Court ultimately agrees with this conclusion, it nonetheless parses Lead Plaintiffs' analysis in order to shed light upon the proper focus of the motive inquiry.

Under the facts alleged, defendants Emmel, Flug, and Grace undoubtedly had a significant pecuniary motive to backdate options. Lead Plaintiffs apparently argue that this "motive to backdate" gives rise to an inference of scienter pursuant to

---

[32] The SAC alleges that defendant Emmel lost $356,062 through the required repayment, while defendants Flug and Grace lost $145,124 and $225,965. (SAC ¶ 95.) These figures are in error, as defendant Emmel aptly notes (Emmel Mot. Dismiss 3), because Lead Plaintiffs misattribute the sums of money each of the defendants "repaid" to Take-Two through the cancellation of options. Lead Plaintiffs have acknowledged their blunder. (Pls.' Opp'n 9 & n.6.) Because there is no evidence that Lead Plaintiffs' mistake has sinister origins, the Court declines Emmel's apparent invitation to hold it against them (Emmel Mot. Dismiss 3.)

[33] Because Exhibit B of the Foldenauer Declaration consists of a copy of Take-Two's Form 8-K, filed on February 23, 2007, the Court may properly consider that Exhibit on Defendants' motions to dismiss. ATSI Commc'ns, 493 F.3d at 98.

Section 10(b) and Rule 10b-5. (See Pls.' Opp'n 46.) Nevertheless, the relevant "fraud" in this case is not the backdating of options, but rather, the alleged misrepresentation of Take-Two's compliance with its options plans and the resulting overstatement of Take-Two's earnings. (SAC ¶¶ 192, 210, 234, 260, 272.) As such, the pertinent question is whether Emmel, Flug, and Grace had a motive to misrepresent Take-Two's compliance with its options plans and overstate Take-Two's revenues, not whether Emmel, Flug, and Grace had a motive to backdate options. Lead Plaintiffs largely elide this distinction.

When the inquiry is properly refocused upon the alleged securities fraud in this case, Lead Plaintiffs' allegations nonetheless support a finding of motive. Emmel, Flug, and Grace arguably could not have obtained backdated options in the absence of fraudulent statements concerning compliance with Take-Two's options plans and, especially, overstatements of Take-Two's earnings. If Take-Two had accurately reported its earnings during the years from 2002 through 2005 to include backdated options as compensation expenses, questions naturally would have arisen regarding Take-Two's compliance with its options plans, thereby potentially upsetting the entire options-backdating scheme. In other words, because the fraudulent statements underlying Lead Plaintiffs' securities claims were an

98

integral part of the alleged options-backdating scheme in which Emmel, Flug, and Grace had a significant motive to participate, these defendants also possessed a significant motive to make those fraudulent statements. See In re Openwave, 528 F. Supp. 2d at 249-50 (ruling that defendants who received backdated options had motive to perpetrate securities fraud).

Defendants Emmel, Flug, and Grace contend, nevertheless, that Lead Plaintiffs' motive allegations are inadequate because their desire for increased compensation is a generalized motive that does not support an inference of scienter. (Emmel Mot. Dismiss 12; Flug & Grace Mot. Dismiss 15-16.) As this Court has stated, "generalized allegations of greed and a desire for increased . . . compensation" do not establish motive. In re AOL Time Warner, Inc. Sec. & "ERISA" Litig., 381 F. Supp. 2d 192, 218 (S.D.N.Y. 2004). Indeed, incentive compensation predicated upon a corporation's share price or financial performance, standing alone, does not provide an adequate basis for motive allegations. Acito, 47 F.3d at 54 (company's share price); In re Mercator, 161 F. Supp. 2d at 148-49 (company's economic performance) Ferber, 785 F. Supp. at 1107 (company's financial performance). In the present case, however, Lead Plaintiffs' motive allegations do not concern the receipt of incentive compensation contingent upon Take-Two's financial performance. Lead Plaintiffs do not allege that defendants Emmel, Flug, or

Grace received more or better options because they inflated Take-Two's earnings. Instead, Lead Plaintiffs allege that these defendants misstated Take-Two's compliance with its options plans and inflated the company's earnings in order to conceal their options-backdating scheme. Although the desire to improve a company's earnings in order to bolster one's income or bonus prospects may be a "generalized" desire common to most high-level corporate employees, the desire to inflate a company's earnings in order to hide options backdating is a much more particularized desire specific to participants in the backdating scheme. Thus, Lead Plaintiffs have sufficiently alleged a concrete and particularized benefit to defendants Emmel, Flug, and Grace, insofar as they allege that these defendants misstated Take-Two's compliance with its options plans in order to protect compensation they had already received, and secure further compensation, through options backdating.

Defendants Flug and Grace further challenge Lead Plaintiffs' motive allegations on the basis that the "proper" exercise price for certain options grants made to them was actually more favorable than the "improper" exercise price originally placed upon such grants. (Flug & Grace Mot. Dismiss 14-15.) An attachment to Take-Two's Form 8-K, filed with the SEC on February 23, 2007, indicates that 17,921 of Flug's options bearing the grant date of September 17, 2002, carried an

original exercise price of $17.33, instead of the proper and more favorable exercise price of $17.17. (Foldenauer Decl Ex. B.) Although these "unfavorably" backdated options tend to undermine Lead Plaintiffs' motive allegations with respect to Flug, they are insufficient at this stage to defeat Lead Plaintiffs' showing of motive. Take-Two's Form 8-K of February 23, 2007, states that the company canceled 43,079 options grants made to Flug and re-priced 19,500 others, on the grounds that these grants were "favorably" backdated. (Foldenauer Decl. Ex. B.) Flug's failure to maximize the profit he could have garnered from options backdating during the relevant time period is not fatal to Lead Plaintiffs' motive allegations, especially given the large number of "favorably" backdated options Flug apparently received. See In re Openwave, 528 F. Supp. 2d at 250 ("That the options may have been backdated to dates 'nowhere near the monthly lows for Openwave stock,' as defendants contend, is irrelevant."). Furthermore, because there is no evidence on the record suggesting that Grace or Emmel received "unfavorably" backdated options, Lead Plaintiffs' motive allegations are not significantly attenuated with respect to these defendants. In short, Flug's receipt of some "unfavorably" backdated options does not alter the Court's finding of motive.

Defendants Flug and Grace also fault Lead Plaintiffs for omitting these defendants' names from charts purporting to show

that certain Take-Two employees received options grants on dates that were likely manipulated.[34] (Flug & Grace Mot. Dismiss 16.) The Court is not persuaded. The evident purpose of the charts in question is to demonstrate that certain Take-Two officers repeatedly received options on dates that represented actual or near-monthly lows, thereby giving rise to a high probability that such options were backdated. Such probabilistic inference-drawing is unnecessary with respect to Flug and Grace, however, because Take-Two's Form 8-K of February 23, 2007, and the agreement entered into by Flug and Grace, clearly indicate that these defendants received improperly dated options. Under these circumstances, the omission of Flug and Grace from the charts at issue has no bearing on the plausibility of Lead Plaintiffs' motive allegations.

    Defendant Emmel further attacks Lead Plaintiffs' motive allegations on the basis that he received such little income from options backdating that "it makes no sense that [he] would be motivated to assist management in a fraud . . . ." (Emmel Reply 6.) Emmel claims that he received approximately $340,000 in direct compensation, in addition to approximately 68,500

_____

[34] Lead Plaintiffs counter that the charts in question were prepared in reliance upon Take-Two's proxy statements, which recorded options grants only to executive officers, not to outside directors. (Pls.' Opp'n 43.) Because the Court rejects Flug and Grace's argument on this point, it need not assess Lead Plaintiffs' response.

options grants, during his tenure as an outside director on Take-Two's board of directors.[35] (Emmel Reply 2 n.2.) Emmel notes that his agreement with Take-Two required only that he repay $59,535.51, through the cancellation of 7,341 of the improperly dated options he received. (Emmel Reply 6.) In fact, however, Emmel's calculation omits reference to more than 35,000 options, which were re-priced at losses to Emmel of approximately $112,000. (Emmel Mot. Dismiss, Declaration of Corey E. Delaney ("Delaney Decl.") Ex. 6.)[36] Given that over half of Emmel's approximately 70,000 options grants were either canceled (7,341) or re-priced (35,079), and because Emmel received over $170,000 in improper compensation as a result, Emmel had ample motive to covertly engage in options backdating, even if he received $340,000 in direct compensation.[37]

---

[35] In making this claim, Emmel cites to various proxy statements filed by Take-Two and appended to Emmel's Motion to Dismiss. (Emmel Reply 2 n.2.) Although these proxy statements are properly before the Court, ATSI Commc'ns, 493 F.3d at 98, it is difficult to divine Emmel's total compensation by reference to them. Nonetheless, because, for the reasons that follow, Lead Plaintiffs have adequately pleaded motive even if Emmel's cited compensation numbers are accurate, the Court assumes them to be so in resolving Emmel's contentions.

[36] Because Exhibit 6 sets forth Take-Two's Form 8-K, filed on February 23, 2007, the Court may properly consider that Exhibit on Defendants' motions to dismiss. ATSI Commc'ns, 493 F.3d at 98.

[37] The case Emmel relies upon, Central Laborers' Pension Fund v. Integrated Electrical Services Inc., 497 F.3d 546 (5th Cir. 2007), is not to the contrary. There, the Fifth Circuit held that the defendant CEO's one-time sale of 30,000 shares for profits equaling approximately 43% of his annual salary did not

In summary, the Court finds that Lead Plaintiffs have adequately alleged that defendants Emmel, Flug, and Grace had motive to misstate Take-Two's compliance with its options plans and misrepresent the accounting consequences of options backdating.

The opportunity prong of the "motive and opportunity" test generally receives less scrutiny than its motive counterpart. See In re GlaxoSmithkline PLC, 05 Cv. 3751 (LAP), 2006 WL 2871968, at *6 (S.D.N.Y. Oct. 6, 2006) ("Where a plaintiff alleges securities fraud against a public company and its officers and directors, it is motive rather than opportunity that is at issue."). Indeed, courts in this District "often assume that . . . corporate directors would have the opportunity to commit fraud if they so desired." Pension Comm. of the Univ. of Montreal Pension Plan, 446 F. Supp. 2d at 181. In order to plead opportunity, a plaintiff must show that the individual defendants possessed "the means and likely prospect of achieving concrete benefits by the means alleged." Shields, 25 F.3d at

---

give rise to an inference of scienter. Id. at 553. The court reasoned that the defendant had only sold some 4% of his total holdings, retaining over 700,000 shares in the defendant corporation. Id. Even setting aside the inherent distinction between the sale of stock and the receipt of compensation in the form of backdated options, the defendant in Central Laborers' realized profits on only 4% of the shares he owned, whereas well over 50% of the options Emmel received were apparently backdated. As such, the holding in Central Laborers' is inapposite.

1130. Here, Lead Plaintiffs have alleged that defendants Flug and Grace served on Take-Two's Compensation Committee from 2000 through 2006, while defendant Emmel served on that committee from 2002 through 2003. (SAC ¶¶ 45-47.) Lead Plaintiffs have also alleged that the Compensation Committee was charged with determining the exercise price of Take-Two's stock-option grants. (SAC ¶¶ 62, 64, 67; see also SAC ¶ 84.) As such, Lead Plaintiffs assert that defendants Emmel, Flug, and Grace had abundant "opportunity to benefit themselves by manipulating the options they granted themselves." (Pls.' Opp'n 42.) Although the Court ultimately agrees with Lead Plaintiffs' conclusion as to these defendants' opportunity to perpetrate fraud, a closer analysis of their allegations is in order.

Lead Plaintiffs' allegations undoubtedly establish that defendants Emmel, Flug, and Grace had the opportunity to backdate options through their service on the Compensation Committee. Nevertheless, the relevant fraud in this case concerns not the backdating of options per se, but rather, alleged misstatements concerning Take-Two's compliance with its options plans and Take-Two's accounting for options grants. Therefore, the pertinent question is whether defendants Emmel, Flug, and Grace had the opportunity to misstate Take-Two's compliance with its options plans and to account improperly for options grants. In this respect, Lead Plaintiffs miss the mark

when they assert that these defendants' purported lack of control over Take-Two's public disclosures regarding its options grants is irrelevant (Pls.' Opp'n 42.) In fact, the ability of Emmel, Flug, and Grace to influence the drafting and preparation of Take-Two's public disclosures is of substantial relevance to the opportunity analysis.

After refocusing the opportunity inquiry upon the securities fraud alleged in this case, the Court nonetheless finds that Lead Plaintiffs' allegations are sufficient. Defendants Emmel, Flug, and Grace, among others, signed the Forms 10-K that contained many of the alleged false statements regarding the Options Backdating Fraud. (SAC ¶¶ 188, 206, 229, 255.) Although it is conceivable that Emmel, Flug, and Grace signed these Forms 10-K without being aware of the false statements contained therein, see, e.g., In re Marsh & McLennan, 501 F. Supp. 2d at 485 ("The mere existence of allegedly misleading language in a group-published document does not compel a conclusion that all of the signatories were aware that it was misleading."), because defendants Emmel, Flug, and Grace were members of a committee charged with ensuring the proper pricing of options (SAC ¶¶ 62-64), it is eminently plausible to infer that they knew of the false statements. Moreover, the preeminent role Take-Two's stock-option plans accorded Emmel, Flug, and Grace in the options granting process, in combination

with these defendants' endorsement of the relevant Forms 10-K,
supports Lead Plaintiffs' allegations that Emmel, Flug, and
Grace had the opportunity to influence at least those portions
of the Forms 10-K that bore on the options-granting process. In
light of these considerations, and given the oft-cited
presumption that corporate directors have the opportunity to
commit fraud, Pension Comm. of the Univ. of Montreal Pension
Plan, 446 F. Supp. 2d at 181, Lead Plaintiffs have adequately
pleaded opportunity with respect to defendants Emmel, Flug, and
Grace.

In sum, the Court holds that Lead Plaintiffs have pleaded
sufficient facts demonstrating that defendants Emmel, Flug, and
Grace had motive and opportunity to commit fraud. Therefore,
Lead Plaintiffs' allegations give rise to an inference that
these defendants acted with the requisite scienter. Cf. In re
Openwave, 528 F. Supp. 2d at 250 (ruling in options-backdating
case that plaintiffs had adequately pleaded scienter of
compensation committee members who were charged with granting
stock options with an exercise price no lower than the fair
market price of the stock on the grant date, because such
individuals were under a specific "duty to monitor" the exercise
dates of options granted) (citing Novak, 216 F.3d 311).

### (2) The Inference That Emmel, Flug, and Grace Acted With Scienter Is More Compelling Than Competing Nonculpable Explanations for Their Conduct

Having found that the SAC pleads facts giving rise to an inference that Emmel, Flug, and Grace acted with scienter, the Court must now determine whether that inference is cogent in light of competing nonculpable explanations for these defendants' conduct. <u>Tellabs</u>, 127 S. Ct. at 2510. In this respect, defendants Emmel, Flug, and Grace argue that the most compelling inference to be drawn from the facts on the record is that they were unaware of the widespread options backdating at Take-Two. As support for this contention, Flug and Grace cite the conclusions of the SC, which ascribed primary responsibility for Take-Two's options backdating to defendant Brant. (Foldenauer Decl. Ex. A.)[38] The SC reported that Brant "control[led] and dominate[d] the [options] granting process," and "engaged in a pattern and practice of backdating options." (Foldenauer Decl. Ex. A.) Moreover, the SC "did not find that [defendants Grace or Flug] . . . engaged in willful misconduct or other dishonest acts" (Foldenauer Decl. Ex. A), and did not even mention defendant Emmel (Emmel Reply 7). Defendants Grace and Flug further note that some options granted to them bore a

---

[38] Exhibit A of the Foldenauer Declaration contains a copy of Take-Two's Form 8-K of January 22, 2007, which cites to the SC's report. Take-Two's Form 8-K is properly before the Court on Defendants' motions to dismiss. <u>ATSI Commc'ns,</u> 493 F.3d at 98.

grant date that was actually less favorable than the proper grant date would have been. (Foldenauer Decl Ex. B.) Moreover, defendant Emmel contends that, as an outside director, he was not, and had no reason to be, aware of how Take-Two accounted for its options grants, and therefore, he cannot be held liable for Take-Two's allegedly fraudulent accounting. (Emmel Reply 2-4.) The Court addresses these contentions in turn.

Lead Plaintiffs' scienter allegations with respect to defendants Emmel, Flug, and Grace rely partly upon the SC's findings. (SAC ¶¶ 84, 98.) Thus, insofar as the SC ultimately absolved Emmel, Flug, and Grace of "willful misconduct," Lead Plaintiffs' scienter allegations are somewhat attenuated. Cf. Fed. R. Evid. 106 (allowing adverse party to introduce omitted portions of writing or recorded statement placed in evidence in order to provide context). Nevertheless, on the record properly before the Court,[39] the SC's conclusions support Lead Plaintiffs'

---

[39] As an attachment to his Reply Memorandum of Law, defendant Emmel submitted a copy of the Report of Kasowitz, Benson, Torres & Friedman LLP and BDO Seidman LLP to the Special Litigation Committee of the Board of Directors of Take-Two Interactive Software, Inc., dated January 17, 2007 (the "Kasowitz Report"). (Emmel Reply, Declaration of Corey E. Delaney ("Delaney Supp. Decl.") Ex. 1.) The Kasowitz Report is apparently the report cited and summarized in Take-Two's 2006 Form 10-K (Wohl Decl. Ex. 9) and Take-Two's Form 8-K of January 22, 2007 (Foldenauer Decl. Ex. A). In addition, the SAC indirectly quotes portions of the Kasowitz Report. (SAC ¶¶ 84, 96-98.)

Although the Kasowitz Report may be relevant to the instant litigation, and despite the SAC's quotation of limited portions

inference of scienter more than they undermine it. Contrary to the interpretation set forth by defendants Emmel, Flug, and Grace, the SC attributed blame for Take-Two's options backdating not only to defendant Brant, but also to other corporate actors. (Foldenauer Decl. Ex. A.)

Most importantly, the SC found that the Compensation Committee, which included defendants Emmel, Flug, and Grace, "abdicated its option granting responsibilities and permitted the Company's prior Chief Executive Officer, Ryan Brant, to control and dominate the granting process." (Foldenauer Decl. Ex. A.) The SC also found that the available contemporaneous documentation used to support Take-Two's options grants was "unreliable, deficient or nonexistent in many cases." (Wohl Decl. Ex. 9.)[40] Because the Compensation Committee was allegedly responsible for ensuring that the purchase price of Take-Two's options was no less than the fair market value of the company's

---

thereof, the Court cannot consider that document without converting Defendants' motions to dismiss into requests for summary judgment. In particular, the Kasowitz Report was not attached to the SAC or quoted in full therein. Moreover, the Kasowitz Report is not a public disclosure document filed with the SEC. Furthermore, Lead Plaintiffs' limited and indirect citations to the Kasowitz Report in the SAC do not constitute incorporation by reference. See Goldman v. Belden, 754 F.2d 1059, 1066 (2d Cir. 1985) ("The documents here were to some extent quoted, but limited quotation does not constitute incorporation by reference."). As such, the Court declines to consider the Kasowitz Report at this time.

[40] Exhibit 9 of the Wohl Declaration contains a copy of Take-Two's 2006 Form 10-K, which is properly before the Court on Defendants' motions to dismiss. ATSI Commc'ns, 493 F.3d at 98.

shares on the grant date (SAC ¶¶ 62-64, 67), the Committee's members possessed a duty to monitor the grant dates and exercise prices of the options Take-Two issued. In re Openwave, 528 F. Supp. 2d at 250. Thus, the SC's finding that the Compensation Committee abdicated its responsibilities actually provides strong support for Lead Plaintiffs' scienter allegations on the theory that Emmel, Flug, and Grace failed to observe their "duty to monitor" stock-option grants. Id.; see also Novak, 216 F.3d at 308 (holding that scienter may be predicated on allegation that defendants "failed to review or check information that they had a duty to monitor"). Therefore, even if the SC's conclusions undermine Lead Plaintiffs' allegations of "willful misconduct," they strongly support Lead Plaintiffs' scienter allegations with respect to Flug, Grace, and Emmel.

In addition, the reliance defendants Flug and Grace have placed upon their alleged receipt of "unfavorably" backdated options is misplaced. Evidence that the backdated options did not, in the aggregate, significantly benefit these defendants would undoubtedly bear upon the relative plausibility of Lead Plaintiffs' scienter allegations. After all, one would not expect an individual to participate knowingly in an unlawful backdating scheme, or to conceal the accounting consequences of such a scheme, if the scheme did not benefit him. Nevertheless, in the instant case defendants Grace and Emmel have not provided

111

any evidence that they received "unfavorably" backdated options.

Moreover, although Flug received approximately 17,000 backdated

options that were slightly unfavorable to him (Foldenauer Decl

Ex. B (noting receipt of options with original exercise price of

$17.33 rather than proper exercise price of $17.17)), materials

properly before the Court also show that Flug received well over

60,000 "favorably" backdated options (Foldenauer Decl. Ex. B).

Flug's failure to maximize the profits he could have garnered

from options backdating is not fatal to Lead Plaintiffs'

scienter allegations, especially because Lead Plaintiffs have

amply alleged that Flug received significant windfalls through

backdating. Indeed, the extent to which defendants Emmel, Flug,

and Grace benefited from the backdating of options--

notwithstanding some "unfavorably" backdated options--weighs

strongly in favor of a finding of scienter.

Furthermore, defendant Emmel's contention that he was

unaware of how Take-Two accounted for its options grants is

unavailing. The SAC alleges that, as a member of the

Compensation Committee, Emmel was responsible for ensuring that

the exercise price for options was not "less than 100% of the

fair market value for each such share on the Date of Grant."

(SAC ¶ 63.) Given this oversight role, Emmel either knew, or was

highly reckless in not knowing, that there was rampant improper

dating of options at Take-Two. It is rather implausible for

Emmel to claim that he did not know this rampant backdating would have significant financial consequences, or that he believed Take-Two had properly expensed improperly dated options, which were granted in violation of the company's stock-option plans. Moreover, some of the alleged material misstatements in Take-Two's public filings pertained not to Take-Two's accounting, but rather to its compliance with the company's stock options plans. (SAC ¶¶ 191, 209, 231, 257.) Emmel's asserted ignorance of Take-Two's accounting does not undermine Lead Plaintiffs' inference of scienter with respect to these statements.

In light of the foregoing, defendants Emmel, Flug, and Grace have not significantly undercut the plausibility of Lead Plaintiffs' proposed inference of scienter. Moreover, these defendants have mustered only weak support for nonculpable explanations of their conduct. The pleadings allege that Emmel, Flug, and Grace were members of the Compensation Committee, which was charged with setting the exercise prices for Take-Two's options grants (SAC ¶¶ 62-64, 67); that these defendants abdicated their options granting responsibilities, approving or acquiescing in options grants for which there is no extant documentary justification (SAC ¶ 98; Wohl Decl. Ex. 9); that these defendants secured substantial personal benefits as a result of options backdating at Take-Two (SAC ¶ 95); and that

these defendants eventually agreed to repay to Take-Two certain sums of money acquired through improperly dated options (SAC ¶¶ 92-95). The most compelling inference to be drawn from these facts is that defendants Emmel, Flug, and Grace acted with scienter. Accordingly, Lead Plaintiffs have adequately pleaded facts giving rise to a strong inference of scienter with respect to Emmel, Flug, and Grace.

### c. The SAC Inadequately Alleges Eibeler's Scienter

Lead Plaintiffs rely principally upon the "motive and opportunity" test to plead defendant Eibeler's scienter. (See Pls.' Opp'n 46.) As with defendants Emmel, Flug, and Grace, Lead Plaintiffs contend that Eibeler's motive to commit fraud arose from his receipt of 140,000 backdated options. (SAC ¶ 40; Pls.' Opp'n 46.) Moreover, Lead Plaintiffs argue that Eibeler possessed the opportunity to commit fraud because he was President and CEO of Take-Two during most, if not all, of the relevant time period. (Pls.' Opp'n 46.) For the reasons that follow, Lead Plaintiffs have adequately pleaded Eibeler's motive and opportunity to commit fraud, which gives rise to an inference of scienter. Nonetheless, the Court holds that this inference of scienter is not "strong," within the meaning of the PSRLA, because it is not as compelling as competing nonculpable explanations for Eibeler's conduct.

### (1)  The SAC Adequately Alleges That Eibeler Possessed Motive and Opportunity

As the Court determined in the previous section, the receipt of significant numbers of backdated options may justify a finding of motive. See supra Part II.A.2.iii.b(1). Here, Lead Plaintiffs' allegation that Eibeler received backdated options rests upon their averment that 140,000 of the 995,000 options granted to Eibeler between 1997 and 2005 bore the date with the lowest share price of the relevant month. (SAC ¶ 77.) Of course, Eibeler's receipt of favorably dated options does not lead ineluctably to the conclusion that those options were improperly dated, or that he knew them to be so. Nevertheless, the Court holds on the record before it that Lead Plaintiffs have established a minimally cognizable financial motive for Eibeler's participation in the backdating of options. Moreover, although Lead Plaintiffs' analysis once again elides the distinction between the motive to backdate options and the motive to misrepresent the accounting consequences of options backdating (see Pls.' Opp'n 42), for the reasons set forth in the Court's discussion of Emmel's, Flug's, and Grace's scienter, see supra Part II.A.2.iii.b(1), Lead Plaintiffs' allegation that Eibeler received backdated options establishes his motive to misstate Take-Two's accounting for such options grants.

With respect to Eibeler's opportunity commit the securities fraud in question, there is no serious dispute. Eibeler served as Take-Two's CEO from January 2005 through March 2007, and as the Company's President from July 2000 through June 2003 and April 2004 through March 2007. (SAC ¶ 40). "[C]ourts often assume that corporations and their officers have the opportunity to commit fraud." In re GeoPharma, 411 F. Supp. 2d at 441 (citation omitted). Given Eibeler's long-standing role as a principal officer of Take-Two, Lead Plaintiffs have adequately pleaded his opportunity to commit the securities fraud in question. In light of the foregoing, the SAC adequately alleges Eibeler's motive and opportunity to commit fraud, which gives rise to an inference of scienter.

> **(2) The Inference That Eibeler Acted With Scienter Is Not as Compelling as Competing Nonculpable Explanations for His Conduct**

Though the SAC adequately alleges Eibeler's motive and opportunity to participate in the Options Backdating Fraud, the SAC's scienter allegations with respect to Eibeler are attenuated in significant respects. First, and perhaps most importantly, Lead Plaintiffs' illation that Eibeler received at least 140,000 backdated options is based on the issuance of those options on the date with the lowest share price of the corresponding month. (SAC ¶ 77.) Thus, unlike the allegations respecting defendants Emmel, Flug, and Grace, who repaid funds

116

received through improperly dated options (SAC ¶ 92), Lead Plaintiffs' allegations do not definitively demonstrate that Eibeler even received backdated options at all. Moreover, although the SAC provides statistical analysis evaluating the improbability, in the aggregate, of the options granted by Take-Two (SAC ¶ 76), there is no similar statistical analysis estimating the probability of random options grants having the timing of those made particularly to Eibeler. The SAC is also devoid of allegations explaining how the 140,000 purportedly suspect options were issued, i.e., whether such options were issued in a one-time grant, or in several grants.[41] Furthermore, the SAC fails to address the effect of the other 850,000 options Eibeler received (SAC ¶ 77) upon the relative improbability of the grants made to him. These considerations all undermine Lead Plaintiffs' seminal allegation that Eibeler received improperly dated options. Inasmuch as Lead Plaintiffs' averment that Eibeler received backdated options is attenuated, the inference that he intentionally or recklessly participated in the Options Backdating Fraud is correspondingly weakened.

---

[41] Such information would assist the Court in evaluating the relative plausibility of the SAC's allegation that Eibeler received backdated options. For instance, the issuance of 140,000 options in several grants, each of which occurred on the date with the lowest share price of the month, might offer stronger support for Lead Plaintiffs' allegation that the options were backdated.

Second, Lead Plaintiffs' proposed culpable inference is further debilitated insofar as errors in the accounting for options grants may not be readily apparent because of the complexity of options accounting. See Weiss, 527 F. Supp. 2d at 949.

Given these considerations, two plausible nonculpable explanations for Eibeler's conduct emerge. First, Eibeler may not have known about options backdating at Take-Two until very recently, after the SC's investigation and Brant's guilty plea. (See Eibeler Mot. Dismiss 2.) Indeed, the SC, which conducted an internal investigation of Take-Two's option granting practices, reached this very same conclusion, finding that defendant Eibeler had not "engaged in any misconduct with respect to the Company's option granting practices."[42] (Foldenauer Decl. Ex. A.) Second, Eibeler may have been aware that options backdating had occurred and even benefited from it, but he may have been unaware that such backdating violated Take-Two's stock-option plans and caused the company to misstate substantially its

---

[42] The SC's conclusion in this respect should be distinguished from its conclusion regarding the culpability of members of the Compensation Committee, including defendants Grace, Flug, and Emmel, who "abdicated [their] option granting responsibilities and permitted the Company's prior Chief Executive Officer, Ryan Brant, to control and dominate the granting process" (Foldenauer Decl. Ex. A). Thus, the SC's findings support differing inferences regarding the culpability of Eibeler on the one hand, and Grace, Flug, and Emmel on the other.

earnings.[43] Although the relative plausibility of these nonculpable explanations is admittedly difficult to discern, on the record as it currently stands, these nonculpable explanations for Eibeler's conduct are more compelling than the culpable inference Lead Plaintiffs advocate.

In this respect, the Court reiterates the weak support for Lead Plaintiffs' allegation that Eibeler received backdated options. While the SAC contains ample evidence of widespread options backdating at Take-Two (SAC ¶¶ 73-76), it contains comparatively little evidence--statistical or otherwise--that the options actually granted to Eibeler were backdated. The SAC's failure to address with more particularity facts showing that defendant Eibeler received backdated options robs Lead Plaintiffs' allegations of some of their relative plausibility.

Additionally, the SC's findings that Eibeler had not "engaged in any conduct raising concerns about the reliability of [his] representations to [Take-Two's] auditors" and that he had not "engaged in any misconduct with respect to the Company's option granting practices" (Foldenauer Decl. Ex. A) lend support

_____

[43] In Tellabs, the Supreme Court instructed lower courts to consider "nonculpable explanations" for the defendant's conduct. 127 S. Ct. at 2510. The Court understands this as an instruction to consider explanations that are nonculpable with respect to the charge of securities fraud, not nonculpable in the abstract. Thus, although Eibeler's conduct under the second explanation described above may be blameworthy, it would nonetheless be "nonculpable" with reference to the securities fraud charge levied against him.

to the plausible nonculpable explanations for his conduct
outlined above. The SC's findings are not conclusive in this
action and cannot absolve Take-Two's officers of liability for
securities fraud. Nonetheless, given that Lead Plaintiffs rely
in part upon the SC's report to support their scienter
allegations (see, e.g., SAC ¶ 96), the ultimate conclusions of
that report with respect to Eibeler's lack of scienter bear upon
the Court's comparative analysis of the available plausible
inferences that may be drawn from the record.

    In light of the absence of sufficient, particularized
allegations showing that Eibeler received backdated options, and
given the SC's findings, which absolved Eibeler of any relevant
misconduct, the inference of scienter proposed by Lead
Plaintiffs is not as compelling as the nonculpable explanations
for Eibeler's conduct. Lead Plaintiffs have adequately alleged
that Eibeler was an important officer and director of Take-Two
(SAC ¶ 40) at a time when there was widespread options
backdating (SAC ¶¶ 74-76), which had significant financial
implications (SAC ¶ 110) and ultimately led to the criminal
conviction of several important Take-Two officers (Pls.' Opp'n,
Wohl Decl. Exs. 1, 2, & 3)[44]. Absent more compelling allegations
that Eibeler knew of this options backdating and its financial

_____

    [44] The Court may take judicial notice of these guilty pleas.
See Sec. & Exch. Comm'n v. Aragon Capital Mgmt., LLC, 07 Cv. 919
(FM), 2008 WL 216320, at *2 (S.D.N.Y. Jan. 16, 2008).

consequences, however, these generalized allegations concerning Eibeler's position at Take-Two and the guilt of some of his associates do not give rise to a strong inference of scienter.

### d. The SAC Inadequately Alleges Winters's Scienter

Because Lead Plaintiffs do not allege that defendant Winters received backdated options, they rely principally upon the circumstantial evidence test to plead his scienter. (SAC ¶¶ 291-92; Pls.' Opp'n 48-49.) The SAC alleges that widespread options backdating occurred at Take-Two during a period lasting over six years. (SAC ¶ 291.) The SAC further alleges that Winters was Take-Two's CFO during at least eighteen months of that six-year period of rampant backdating. (SAC ¶ 292.) In that role, Winters allegedly enjoyed "access to internal corporate documents, conversations and connections with other corporate officers and employees, [and] attendance at management meetings and committees thereof." (SAC ¶ 41(b).) The SAC also avers that Winters signed various Take-Two SEC filings, which improperly accounted for option grants and contained false information about the Company's compliance with its stock-option plans. (SAC ¶¶ 188, 194, 199, 203, 206, 212, 219, 224, 237, 244, 249, 263, 268.) Furthermore, the SAC alleges that Winters "repeatedly certified" in Take-Two's SEC filings during the Class Period that he had designed disclosure controls and procedures to ensure that material information regarding Take-Two and its

121

consolidated subsidiaries was made known to him. (SAC ¶ 41.) On the strength of these allegations, Lead Plaintiffs claim that Winters knew of the falsity of Take-Two's asserted compliance with its stock-option plans and accounting for option grants, or was reckless in connection therewith. (SAC ¶¶ 41(b), 292.)

Lead Plaintiffs' scienter allegations with respect to defendant Winters fall far short of the mark. "[G]eneral allegations regarding the magnitude of the fraud or the organizational role of a defendant are insufficient to raise a strong inference of a defendant's scienter." In re Marsh & McLennan, 501 F. Supp. 2d at 483 (citations omitted). Thus, Lead Plaintiffs' allegations regarding the extended duration of options backdating at Take-Two and Winters's role as CFO do not give rise to a strong inference of scienter. Likewise, "[t]he mere existence of allegedly misleading language in a group-published document does not compel a conclusion that all of the signatories were aware that it was misleading." Id. at 485 (citation omitted). Therefore, the presence of Winters's signature on relevant SEC filings that allegedly contained misstatements does not give rise to a strong inference of scienter. The Court reaches the same conclusion with respect to Winters's Sarbanes-Oxley certifications that he had designed adequate disclosure and control mechanisms. For the reasons set forth persuasively in Garfield v. NDC Health Corporation, a

Sarbanes-Oxley certification is probative of scienter only if the complaint alleges specific contrary information, such as "glaring accounting irregularities or other 'red flags,'" of which the certifying defendant had "reason to know." 466 F.3d 1255, 1266 (11th Cir. 2006.) Here, however, the SAC fails to allege that Winters possessed, or had access to, any specific, contemporaneous information that contradicted the company's public statements regarding its option grants.

Indeed, Lead Plaintiffs allege that responsibility for determining the exercise price of stock options rested with the Board of Directors or the Compensation Committee. (SAC ¶¶ 62-64, 67.) Lead Plaintiffs do not allege, however, that Winters ever served on Take-Two's Board or on the Compensation Committee, nor do they aver that Winters possessed a specific duty to monitor the options-granting activities of these other entities. As such, there is no reason to conclude that Winters possessed or had access to information that contradicted Take-Two's public statements. Furthermore, Lead Plaintiffs' contention that Winters was under a generalized "duty to monitor" options grants (Pls.' Opp'n 48) is unsupported.

Apparently to bolster the SAC's scienter allegations with respect to Winters, Lead Plaintiffs raised for the first time in their opposition brief the guilty plea of Patti Tay ("Tay"), one of Winters's subordinates, to falsifying business records.

(Pls.' Opp'n 48 & Wohl Decl. Ex. 2.) Although the Court may take judicial notice of Tay's guilty plea, <u>Sec. & Exch. Comm'n v. Aragon Capital Mgmt., LLC</u>, 07 Cv. 919 (FM), 2008 WL 216320, at *2 (S.D.N.Y. Jan. 16, 2008), Lead Plaintiffs may not cure pleading defects by including new allegations in their opposition memorandum, <u>Goplen v. 51job, Inc.</u>, 453 F. Supp. 2d 759, 774 (S.D.N.Y. 2006) (citation omitted). Thus, insofar as Lead Plaintiffs newly allege in their opposition brief that Winters failed to carry out his duty to monitor Tay--a duty not mentioned in the SAC--that allegation is not properly before the Court. More importantly, even if this allegation were properly considered, it would not give rise to a strong inference of scienter. In particular, Lead Plaintiffs have failed to allege, in their opposition memorandum or elsewhere, that Winters should have been aware of Tay's misconduct, including her alleged maintenance of a spreadsheet containing falsified options-backdating data (Pls.' Opp'n 48). Under these circumstances, Lead Plaintiffs' new allegations with respect to Tay amount to little more than arguments for guilt by association, which this Court has rejected in no uncertain terms: "Simply arguing that specific high level employees must have known what was taking place . . . because certain subordinate employees were later implicated in the fraud is insufficient to give rise to [a]

strong inference of scienter . . . ." In re Marsh & McLennan, 501 F. Supp. 2d at 484.

In light of the foregoing, the Court finds that Lead Plaintiffs have failed to plead sufficient circumstantial evidence that Winters knew of the false statements in Take-Two's relevant public filings, or that Winters was reckless in connection therewith. In particular, Lead Plaintiffs have not alleged any specific information, which Winters possessed or could access, that contradicted Take-Two's public statements. As such, Lead Plaintiffs have failed to allege facts giving rise to an inference that Winters acted with scienter.

### e. The SAC Adequately Alleges Take-Two's Scienter

Courts "readily attribute[] the scienter of management-level employees to corporate defendants." In re Marsh & McLennan, 501 F. Supp. 2d at 481 (citations omitted). Here, Lead Plaintiffs have adequately alleged scienter with respect to defendant Brant, the former CEO of Take-Two, and with respect to defendants Emmel, Flug, and Grace, who were members of Take-Two's Compensation Committee. Thus, Lead Plaintiffs have adequately alleged Take-Two's scienter.[45]

---

[45]    Indeed, Take-Two does not contest this point. (See generally Take-Two Options Mot. Dismiss.) Once again, Lead Plaintiffs' options backdating allegations apparently do not apply to the Rockstar Defendants. See supra note 20. In any event, given the utter lack of allegations implicating Rockstar or its employees in the alleged options backdating scheme at

In summary, Lead Plaintiffs have adequately pleaded that defendants Take-Two, Brant, Emmel, Flug, and Grace violated Section 10(b) and Rule 10b-5 through their alleged involvement in the Options Backdating Fraud. In addition, Lead Plaintiffs have sufficiently pleaded loss causation only with respect to the July 10 Disclosure. In all other respects, Count I of the SAC is dismissed.

**B. Claims for Violations of Section 20(a) of the Exchange Act**

Under Section 20(a) of the Exchange Act,

> [e]very person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). In order to plead a violation of Section 20(a), a plaintiff must allege adequate facts showing that (1) there was an underlying primary violation, (2) the defendant exercised control over the primary violator, and (3) the defendant culpably participated in the primary violation. In re Marsh & McLennan, 501 F. Supp. 2d at 493 (citing Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998)). Here, Lead Plaintiffs allege primary violations of Section 10(b) of the Exchange Act

---

issue here, Lead Plaintiffs have failed to allege that Rockstar possessed scienter.

and Rule 10b-5, arising out of both the GTA:SA Fraud, and the Options Backdating Fraud. Lead Plaintiffs allege that these primary violations give rise to control-person claims against Brant, Eibeler, and Winters as to Take-Two (SAC ¶¶ 347-51), and against Take-Two, Donovan, and Houser as to Rockstar (SAC ¶¶ 352-56). The Court separately addresses the SAC's control-person claims stemming from the GTA:SA Fraud and the Options Backdating Fraud.

### 1. The GTA:SA Fraud

As set forth *supra* in Part II.A.1, the SAC's allegations with respect to the GTA:SA Fraud fail to state a primary violation of Section 10(b) of the Exchange Act and Rule 10b-5. Having failed to plead a primary violation of the Exchange Act, the SAC's control-person claims with respect to the GTA:SA Fraud necessarily fail as well. Because Rockstar was implicated only in the GTA:SA Fraud, *see supra* note 20, the Court must dismiss all control-person claims predicated upon Rockstar's alleged primary violation. Thus, Count III of the SAC is dismissed in its entirety.[46] Moreover, insofar as the control-person claims in

---

[46] In its motion to dismiss, Take-Two challenges the sufficiency of Count III's control and culpable participation allegations. (Take-Two GTA:SA Mot. Dismiss 22-23.) Donovan and Houser join in these challenges. (Houser, Donovan & Rockstar Mot. Dismiss 7.) The Court briefly addresses these arguments in order to facilitate the resolution of Lead Plaintiffs' anticipated motion to amend the SAC. First, the SAC adequately places defendants Take-Two, Donovan, and Houser on notice

Count II are predicated upon Take-Two's alleged involvement in the GTA:SA Fraud, that count is also dismissed.

## 2. The Options Backdating Fraud

As elucidated in Part II.A.2., the SAC has adequately pleaded that Take-Two, Brant, Emmel, Flug, and Grace committed primary violations of Section 10(b) and Rule 10b-5 by participating in the Options Backdating Fraud. Because Count II of the SAC charges Brant, Eibeler, and Winters with control-person liability as to Take-Two, that count has satisfied the first prong of the control-person liability test by sufficiently stating that Take-Two committed an underlying primary violation.

---

regarding these defendants' alleged control-person status and the reasons therefor. In particular, the SAC alleges that Take-Two, Donovan, and Houser "had the power to influence and control and did influence and control, directly or indirectly, the decision-making of [Rockstar], including the content and dissemination of the statements concerning [GTA:SA] and the ESRB which [Lead Plaintiffs] contend are false and misleading" (SAC ¶ 354), and that "these defendants had direct and supervisory involvement in the day-to-day operations of [Rockstar]" (SAC ¶ 355). See In re Marsh & McLennan, 501 F. Supp. 2d at 494 (finding similar control allegations sufficient). Furthermore, the SAC's allegations concerning e-mails exchanged by Donovan, Houser, and at least one employee of Take-Two (SAC ¶¶ 133-38) lend additional support to the SAC's control allegations. Therefore, Count III's control allegations survive scrutiny.

Second, the Court's scienter analysis in Part II.A.1.iii.a & e controls Count III's culpable participation allegations. See infra note 47 (stating that culpable participation element requires showing of at least recklessness in same sense required by Section 10(b) and Rule 10b-5). Thus, for the same reasons that the SAC fails to plead scienter with respect to Donovan, Houser, and Take-Two in connection with the GTA:SA Fraud, the SAC also fails to plead that these defendants culpably participated in that fraud.

Furthermore, Count II's control allegations with respect to Brant, Eibeler, and Winters are sufficient. "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" Sec. & Exch. Comm'n v. First Jersey Sec., Inc., 101 F.3d 1450, 1472-73 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2). Control allegations are evaluated under the liberal pleading standard set forth in Federal Rule of Civil Procedure 8(a). In re WorldCom, Inc. Sec. Litig. 294 F. Supp. 2d 392, 415-16 (S.D.N.Y. 2003). Here, the SAC alleges that Brant, Eibeler, and Winters "had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading" (SAC ¶ 349), and that "these defendants had direct and supervisory involvement in the day-to-day operations of the Company" (SAC ¶ 350). Moreover, Brant was the CEO of Take-Two during much of the alleged backdating (SAC ¶ 42), Eibeler was President and CEO of Take-Two during significant portions of the alleged backdating (SAC ¶ 40), and Winters was CFO of the company during portions of the alleged backdating (SAC ¶ 41). These allegations give defendants Brant, Eibeler, and Winters

fair notice of the grounds on which Lead Plaintiffs' control allegations rest and are therefore sufficient to plead these defendants' actual control. See In re Marsh & McLennan, 501 F. Supp. 2d at 494.

Nevertheless, Lead Plaintiffs' culpable participation allegations are sufficient only with respect to defendant Brant. In order to plead that a defendant culpably participated in an alleged fraud, plaintiffs must adequately allege that the defendant acted at least with recklessness, in the sense required by Section 10(b) of the Exchange Act and Rule 10b-5.[47]

---

[47] There has been considerable debate in this District concerning the applicability and content of the culpable participation element of Section 20(a). See, e.g. In re Livent, Inc. Noteholders Sec. Litig., 151 F.Supp.2d 371, 413-18 (S.D.N.Y. 2001) (holding that culpable participation element requires pleading of at least recklessness); In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d 281, 393-96 (S.D.N.Y. 2003) (holding that culpable participation element does not require pleading of scienter); In re Parmalat Sec. Litig., 375 F. Supp. 2d 278, 310 (S.D.N.Y. 2005) (holding that culpable participation is not an element of control-person liability claim). This Court has held that plaintiffs must plead at least recklessness, in the sense required by Section 10(b) of the Exchange Act and Rule 10b-5, in order to state a claim under Section 20(a). See In re Marsh & McLennan, 501 F. Supp. 2d at 494; accord In re AOL Time Warner, 381 F. Supp. 2d at 233 & n.42. Although the Second Circuit recently stated that culpable participation is an element of Section 20(a), ATSI Commc'ns, 493 F.3d at 108, it has not definitively resolved the split in this District over the meaning of that term. See, e.g., In re Parmalat Sec. Litig., 497 F. Supp. 2d 526, 532 n.42 (S.D.N.Y. 2007) (holding that culpable participation is not an element of Section 20(a), and that apparent statement to contrary in ATSI Commc'ns was dicta). Absent further direction from the Second Circuit, the Court reaffirms its holding that plaintiffs must

In re Marsh & McLennan, 501 F. Supp. 2d at 494. Moreover, plaintiffs must plead culpable participation with particularity, as required by the PSLRA. In re Alstom, 406 F. Supp. 2d at 491 (citing 15 U.S.C. § 78u-4(b)(2)). Here, for reasons explicated more fully in Part II.A.2.iii.c & d, the SAC fails to allege that Eibeler and Winters knew, or were reckless in not knowing, that Take-Two had fraudulently misrepresented its compliance with the company's options plans and had misstated its accounting for options grants. Therefore, Count II does not adequately allege culpable participation by Eibeler and Winters in the options backdating fraud. See In re Marsh & McLennan, 501 F. Supp. 2d at 494 (dismissing Section 20(a) claims against defendants with respect to whom plaintiffs failed to allege scienter element of Section 10(b) claims). On the other hand, because the Court has determined that the SAC adequately pleads Brant's scienter with respect to the Options Backdating Fraud, see supra Part II.A.2.iii.a, Count II sufficiently alleges Brant's culpable participation in that fraud as well. In re AOL Time Warner, 381 F. Supp. 2d at 235 (indicating that adequate scienter allegations necessarily satisfy culpable participation element).

---

plead at least recklessness in order to state a claim under Section 20(a) of the Exchange Act.

In light of the foregoing, the SAC pleads a violation of Section 20(a) only with respect to Brant, in connection with his control over Take-Two in the alleged perpetration of the Options Backdating Fraud.[48] Therefore, Count III of the SAC is dismissed in its entirety. Moreover, Count II is dismissed with respect to all defendants other than Brant, and with respect to Brant, Count II stands only insofar as it concerns the Options Backdating Fraud.

**C. Claims for Violations of Section 20A(a) of the Exchange Act**

Section 20A(a) of the Exchange Act creates a private right of action to address insider trading, providing that:

> "Any person who violates any provision of [the Exchange Act] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . securities of the same class."

15 U.S.C. § 78t-1(a). In order to state a claim under Section 20A(a), plaintiffs must: (1) plead a predicate insider trading violation of the Exchange Act, see Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 703 (2d Cir. 1994); In re

---

[48] The SAC also adequately alleges that Brant was a primary violator of the Exchange Act. See supra Part II.A.2. "Although [Brant] ultimately may not be held liable as both a primary violator and a controlling person, such alternative theories of liability are permissible" at this stage of the proceedings. In re Parmalat Sec. Litig., 375 F. Supp. 2d at 310 (citations omitted).

Refco, 503 F. Supp. 2d at 664 (indicating that "predicate violation must be an act of insider trading"), and (2) allege sufficient facts showing "that the defendant traded the security at issue 'contemporaneously' with the plaintiff," In re Openwave, 528 F. Supp. 2d at 255.[49] Here, Count IV of the SAC alleges that defendants Winters, Flug, and Grace violated Section 20A(a) of the Exchange Act by selling Take-Two stock "during the period after the 'Hot Coffee' mod became known to Take-Two executives, on or about June 10, 2005, and [before] the re-rating of [GTA:SA] by the ESRB on July 20, 2005" (SAC ¶ 359). However, for the reasons set forth below, the SAC fails to plead a predicate insider trading violation of the Exchange Act. Thus, Lead Plaintiffs' Section 20A(a) claims necessarily fail.

As the Court determined supra in Part II.A.1.iii.c & d, the SAC fails to plead that Emmel, Flug, Grace, and Winters violated Section 10(b) and Rule 10b-5 in connection with the GTA:SA Fraud because it fails to allege facts giving rise to a strong

---

[49] Judge Cote has enumerated a three-element test to evaluate claims under Section 20A(a). In re Openwave, 528 F. Supp. 2d at 255. The third element of that test requires allegations that the defendant possessed material, nonpublic information at the time of the trade. Id. Because the first element of the test enunciated by this Court requires that the predicate violation have involved insider trading, it effectively subsumes the third element of Judge Cote's test. See In re Enron Corp. Sec., Derivative & "ERISA Litig.", 258 F. Supp. 2d 576, 599 (S.D. Tex. 2003) (setting forth two-element test similar to that stated above). Therefore, the two-element test stated by the Court herein requires essentially the same showing as its three-element counterpart.

inference that these defendants acted with scienter. Accordingly, Lead Plaintiffs may not predicate their Section 20A(a) allegations upon the alleged misstatements contained in Take-Two's 2004 and 2005 Forms 10-K concerning the company's compliance with the ESRB's rating requirements. Flug, Grace, and Winters contend that Lead Plaintiffs' failure to plead an underlying violation of Section 10(b) and Rule 10b-5 arising out of Take-Two's alleged material misrepresentations is fatal to their Section 20A(a) claims. (Flug & Grace Mot. Dismiss 20; Winters Mot. Dismiss 2 n.3.) Lead Plaintiffs parry, arguing that they may predicate their Section 20A(a) claims upon these defendants' violations of the prohibition on insider trading contained in Section 10(b) and Rule 10b-5. (Pls.' Opp'n 78.) Thus, even if they have failed to state a claim for material misrepresentations in violation of Section 10(b) and Rule 10b-5, Lead Plaintiffs assert that they have stated a viable claim for insider trading under those provisions. For the reasons that follow, the Court disagrees with Lead Plaintiffs.

"Under the 'traditional' or 'classical theory' of insider trading liability," a corporate insider violates Section 10(b) and Rule 10b-5 if he "trades in the securities of his corporation on the basis of material, nonpublic information." United States v. O'Hagan, 521 U.S. 642, 651-52 (1997). Such trading violates Rule 10b-5(a) because it "qualifies as a

'deceptive device.'" _Id._ at 652 (citation omitted). Although Lead Plaintiffs claim that they "have fully pled" the elements of an insider trading claim under Section 10(b) and Rule 10b-5 (Pls.' Opp'n 78), they also expressly state that they "do not assert claims under SEC Rule 10b-5(a) and (c)" (Pls.' Opp'n 25 n.9), which constitute the only provisions that could give rise to an insider trading claim, _Chiarella v. United States_, 445 U.S. 222, 225 n.5 (1980) (indicating that only Rule 10b-5(a) and (c) were at issue in case involving alleged insider trading because Rule 10b-5(b) deals with alleged material misrepresentations). Thus, Lead Plaintiffs' own representations cast substantial doubt upon the sufficiency of their predicate insider trading claim under Section 10(b) and Rule 10b-5.

Even looking past Lead Plaintiffs' abjuration of reliance upon Rule 10b-5(a) and (c), the Court holds that the SAC fails to plead that Winters, Flug, and Grace committed a predicate insider trading violation. Although Lead Plaintiffs conclusorily aver that Winters, Flug, and Grace possessed material, nonpublic information regarding the Sex Minigame (SAC ¶ 360), the SAC is devoid of particularized[50] allegations tending to show that these

---

[50]    Although there is some dispute as to whether the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA should apply to claims brought under Section 20A, _see_ _In re Openwave_, 528 F. Supp. 2d at 255, the Court holds that these pleading requirements should apply in the instant case, _see_ _id._ at 255 n.10 (concluding that Rule 9(b)

defendants knew that the wrapped Sex Minigame was present in GTA:SA's code. Significantly, the quoted e-mail exchanges (SAC ¶¶ 125, 133-38) upon which Lead Plaintiffs rely show only that defendants Brant, Houser, and Donovan, as well as certain Rockstar employees, knew of the Sex Minigame and were actively considering its impact upon the GTA:SA's likely rating; these exchanges do not implicate Winters, Flug, and Grace. Furthermore, the SAC fails to allege facts showing that Winters, Flug, and Grace knew the Sex Minigame would be discovered, or that it had been discovered, when they made their stock sales in June 2005. In this respect, Lead Plaintiffs' reference to an e-mail received by defendant Donovan on June 10, 2005, which reported discussion of "Hot Coffee" on a modder website (SAC ¶

should apply and suggesting that PSLRA should apply as well). Because Lead Plaintiffs' Section 20A claim rests upon an alleged predicate violation of Rule 10b-5(a)'s prohibition on deceptive devices, O'Hagan, 521 U.S. at 652 ("Trading on [inside] information qualifies as a 'deceptive device' under § 10(b) . . . because 'a relationship of trust and confidence [exists] between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation.'") (quoting Chiarella, 445 U.S. at 228) (alteration in original), that claim sounds in fraud. Thus, Lead Plaintiffs must "state with particularity the circumstances constituting [that] fraud," as required by Federal Rule of Civil Procedure 9(b). See In re Marsh & McLennan, 2007 WL 3407064, at *5 (holding that Federal Rule of Civil Procedure 9(b) applies to claims that "sound in fraud") (internal quotation marks and citations omitted). Likewise, as Lead Plaintiffs' predicate claim requires proof that Winters, Flug, and Grace possessed, i.e., knew, material, nonpublic information, they must "state with particularity facts giving rise to a strong inference that the defendants acted with [such knowledge]," as required by the PSLRA, 15 U.S.C. § 78u-4(b)(2).

314), is plainly inadequate to impute knowledge to Winters, Flug, and Grace. In particular, Lead Plaintiffs fail to allege that this e-mail, or its contents, ever reached any Take-Two employees, let alone Winters, Flug, or Grace. Moreover, Lead Plaintiffs do not explain why knowledge of this e-mail should be imputed to an officer or directors of Take-Two, the parent company of Donovan's employer, Rockstar. These same deficiencies characterize the e-mail written by Houser, another Rockstar officer, on June 14, 2005. (SAC ¶ 141.)

Therefore, the SAC fails to allege sufficient facts showing that Winters, Flug, and Grace possessed material, nonpublic information concerning the existence of the Sex Minigame, the creation of the "Hot Coffee" mod, and the adverse consequences that mod might have for Take-Two. Under these circumstances, Lead Plaintiffs have failed to allege a predicate insider trading violation of Section 10(b) and Rule 10b-5, in connection with the sale of stock by Winters, Flug, and Grace in June 2005. See In re Enron Corp. Sec., Derivative & "ERISA Litig.", 258 F. Supp. 2d 576, 632 n.64, 632-33 (S.D. Tex. 2003) (holding that complaint did not state predicate insider trading violation of Section 10(b) and Rule 10b-5 because it failed to allege adequate facts showing that defendants possessed specific, nonpublic information about alleged fraud). Accordingly, Lead

Plaintiffs have failed to state a claim under Section 20A(a) of the Exchange Act, and Count IV of the SAC must be dismissed.[51]

---

[51] Defendants Flug and Grace also vigorously contest Lead Plaintiffs' contemporaneousness allegations. (Flug & Grace Mot. Dismiss 23-25.) "Congress did not define the term 'contemporaneous' as used in § 20A, but instead apparently intended to adopt the definition 'which has developed through the case law.'" Neubronner v. Milken, 6 F.3d 666, 670 n.5 (9th Cir. 1993) (citing H.R. Rep. No. 910, at 27 (1988), reprinted in 1988 U.S.C.C.A.N. 6043, 6064). Several cases have adopted a restrictive definition of "contemporaneousness," which is satisfied only where plaintiffs allege that they have traded on the same day as insiders. See, e.g., In re Fed. Nat'l Mortgage Ass'n Sec., Derivative & "ERISA" Litig., 503 F. Supp. 2d 25, 47 (D.D.C. 2007); In re MicroStrategy, Inc. Sec. Litig., 115. F. Supp. 2d 620, 663-64 (E.D. Va. 2000); In re AST Research Sec. Litig., 887 F. Supp. 231, 234 (C.D. Cal. 1995). Whatever the merits of this restrictive definition, see In re Fed. Nat'l Mortgage Ass'n, 503 F. Supp. 2d at 46 (indicating that same-day rule serves as substitute for privity, ensuring that plaintiffs recover only if they actually could have traded with insider defendants), it runs contrary to the weight of authority in this Circuit, which maintains that trades are contemporaneous if they occur within a reasonable period of time, usually limited to a few days, of one another, see, e.g., Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 495 F.2d 228, 241 (2d Cir. 1974) (holding that insider trading liability could be premised upon insider sales four days removed from plaintiffs' purchases); In re Openwave, 528 F. Supp. 2d at 256 & n.12 (finding that contemporaneousness was adequately alleged where plaintiffs specifically alleged dates on which insider sales occurred and further averred that putative class members had purchased shares contemporaneously with those sales); In Oxford Health Plans, Inc. Sec. Litig., 187 F.R.D. 133, 144 (S.D.N.Y. 1999) (holding that "standard for contemporaneity is a reasonable period" and ruling that trades falling within five days of alleged insider trades were contemporaneous under facts of case); In re Am. Bus. Computers Corp. Sec. Litig., MDL 913, 1994 WL 848690, at *4 (S.D.N.Y. Feb. 24, 1994) (declining to adopt bright-line rule defining contemporaneousness and holding that "class action may be maintained on behalf of all persons who purchased stock on an exchange during the period that defendants were selling that stock on the basis of insider information").

**D. Leave to Amend the SAC**

Lead Plaintiffs have requested leave to amend the SAC to redress any deficiencies the Court might identify therein. (Pls. Opp'n 80-81.) Under Federal Rule of Civil Procedure 15(a)(2), a "court should freely give leave [to amend] when justice so requires." Indeed, "[w]hen a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." Ronzani v. Sanofi S.A., 899 F.2d 195, 198 (2d Cir. 1990) (internal quotation marks and citation omitted). This is especially true when a complaint is dismissed for lack of specificity under Federal Rule of Civil Procedure 9(b), see Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir. 1986) ("Complaints dismissed under Rule 9(b) are almost always dismissed with leave to amend.") (internal quotation marks and citation omitted), or

Here, Winters allegedly sold shares just one day prior to Lead Plaintiffs' June 15 purchase, Flug sold shares five business days before Lead Plaintiffs' June 24 purchase, and Grace sold shares one business day prior to that June 24 purchase. Under the circumstances of this case, Lead Plaintiffs have adequately alleged that Lead Plaintiffs' June 15 purchase was contemporaneous with Winters's sale, and Lead Plaintiffs' June 24 purchase was contemporaneous with the alleged sales by Flug and Grace. These defendants, however, may not be held liable for purchases Lead Plaintiffs carried out before the alleged insider trading in question. See O'Connor & Assocs. v. Dean Witter Reynolds, Inc., 559 F. Supp. 800, 803 (S.D.N.Y. 1983) ("[L]iability does not extend to those who traded prior to the defendant's breach of his duty to 'disclose or abstain'-- that is, prior to the date of the defendant's trades."); see also In re Verifone Sec. Litig., 784 F. Supp. 1471, 1489 (N.D. Cal. 1992), aff'd 11 F.3d 865 (9th Cir. 1993) ("No liability can attach for trades made by plaintiffs before the insider engages in trading activity.") (citation omitted).

for failure to plead scienter under the PSLRA, see Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003) (emphasizing importance of adherence to liberal amendment standards in context of complicated pleading rules of PSLRA). Here, the defendants argue that Lead Plaintiffs should nonetheless be denied leave to amend because they have already filed three complaints (Take-Two GTA:SA Mot. Dismiss 2), and because any amendment would be futile (Flug & Grace Reply 13-14).

As an initial matter, the Court is not persuaded that it should deny leave to amend because the SAC constitutes Lead Plaintiffs' third "bite at the apple." In fact, there is significant doubt as to whether Lead Plaintiffs should be charged with filing three complaints because "[t]his action was initially filed by unrelated parties with unrelated counsel" (Pls.' Opp'n 80). Thus, Lead Plaintiffs apparently have only filed two complaints up to this point, i.e., the AC and the SAC. More importantly, the Court had not evaluated the deficiencies in Lead Plaintiffs' pleadings before the publication of this Opinion, nor have Lead Plaintiffs had the benefit of full adversarial briefing of their pleadings before the filing of the motions under consideration. Under these circumstances, Lead Plaintiffs are effectively seeking a second "bite at the apple," not a third or fourth bite as the defendants would have it. See

Goldberg v. Meridor, 567 F.2d 209, 213 (2d Cir. 1977) (Friendly,
J.) (where plaintiff amended complaint before anything had been
"said by the defendants or the judge concerning the alleged
inadequacy of his pleading of the federal claim," plaintiff "was
seeking a second round, not a third" by requesting further leave
to amend).

Furthermore, although a court may deny leave to amend where
any amendment would be futile, see Lucente v. Int'l Bus. Machs.
Corp., 310 F.3d 243, 258 (2d Cir. 2002) (citations omitted), the
Court is not convinced that repleading would be futile in this
case. The deficiencies in Count I of the SAC largely concern the
SAC's failure to allege facts giving rise to an inference that
Defendants acted with scienter, and to attribute certain key
statements to Brant, Donovan, and Houser. The deficiencies in
Count IV of the SAC relate to the SAC's failure to allege facts
giving rise to an inference that Winters, Flug, and Grace
possessed specific, nonpublic information at the time that they
traded in Take-Two common stock. Any deficiencies in Counts II
and III of the SAC derive in the main from shortcomings in Count
I. The bulk of these identified deficiencies may be cured if
Lead Plaintiffs muster further averments demonstrating, inter
alia, that Defendants knew the ESRB's rules required disclosure
of wrapped content; that Brant, Houser, and Donovan should be
held responsible for statements made in Take-Two's 2004 and 2005

141

Forms 10-K; that Eibeler and Winters knew that others at Take-Two were engaged in widespread options backdating, which had significant financial implications for the company; and that Winters, Flug, and Grace possessed material, nonpublic information concerning the Sex Minigame and the creation of the "Hot Coffee" mod at the time that they traded in Take-Two stock. Given the possibility that Lead Plaintiffs might come forward with such allegations, repleading is not necessarily futile in this case.

In light of the foregoing, the Court finds no reason to deviate from the general policy that leave to amend should be granted liberally in cases alleging securities fraud. Accordingly, the Court hereby grants Lead Plaintiffs' request to amend the SAC in order to cure the deficiencies identified in this Opinion.

## III. CONCLUSION

In summary, Defendants' motions to dismiss the SAC are granted in part and denied in part. Count I of the SAC is dismissed insofar as it rests upon the <u>GTA:SA</u> Fraud, and inasmuch as it asserts claims against defendants Eibeler, Winters, Donovan, Houser, and Rockstar. Count II of the SAC is dismissed insofar as it is premised upon the <u>GTA:SA</u> Fraud, and inasmuch as it asserts claims against Eibeler and Winters. Counts III and IV of the SAC are dismissed in their entirety.

Lead Plaintiffs' further amended complaint, along with a memorandum explaining how their amendments have cured the defects specified herein by the Court, shall be filed on or before May 19, 2008. Defendants' memoranda in opposition to Lead Plaintiffs' further amended complaint shall be filed on or before June 16, 2008. Lead Plaintiffs' reply memorandum shall be filed on or before June 30, 2008. Any request for modification of this schedule shall be made in writing and shall state good cause therefor.

SO ORDERED.

_____
SHIRLEY WOHL KRAM
UNITED STATES DISTRICT JUDGE

Dated:    New York, New York
          April 16, 2008

Lead Plaintiffs' further amended complaint, along with a memorandum explaining how their amendments have cured the defects specified herein by the Court, shall be filed on or before May 19, 2008. Defendants' memoranda in opposition to Lead Plaintiffs' further amended complaint shall be filed on or before June 16, 2008. Lead Plaintiffs' reply memorandum shall be filed on or before June 30, 2008. Any request for modification of this schedule shall be made in writing and shall state good cause therefor.

SO ORDERED.

SHIRLEY WOHL KRAM
UNITED STATES DISTRICT JUDGE

Dated:    New York, New York
          April 16, 2008



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/16/08